Argued October 27; decided November 30, 1896.

## STATE v. STOCKMAN.
(46 Pac. 851.)

Warehouse—Code, §§ 4201-4207.—A warehouse, within the meaning of the provisions of sections 4201-4207, Hill's Code, is a place where any of the commodities enumerated in such sections are received on storage for the owner by some one engaged in the general business of receiving such goods in store for profit or compensation; therefore, to sustain a conviction under this "Warehouse Act," as it is called, it must be shown that some of the articles named in the statute were placed on storage in some building that was a "warehouse" under that act

From Marion: Geo. H. Burnett, Judge.

John R. Stockman was convicted of violating one of the provisions of the legislative act set forth in sections 4201-4207 of Hill's Code, relating to the conduct and management of public warehouses.

Reversed.

For appellant there was a brief over the names of *Messrs. Martin L. Pipes, Starr, Thomas & Chamberlain,* and *Tilmon Ford,* with an oral argument by *Mr. Pipes.*

For the State there was a brief over the signatures of *Messrs. Cicero M. Idleman,* Attorney-General, and *Samuel Hayden,* District Attorney, with oral arguments by *Messrs. Idleman* and *John M. Somers.*

Opinion by MR. JUSTICE BEAN.

The defendant, John R. Stockman, was convicted of a violation of section 4 of the act of 1885, commonly known as the "Warehouse Act," being section 4204 of Hill's Code, by shipping wheat stored in a warehouse of which he was the manager, without the written assent of the holder of the receipt therefor.    The facts are that at the time of the commission of the alleged crime the defendant was the manager of the Red Crown Roller Mills, a corporation owning and operating a flouring mill in Albany, Oregon, and engaged in the business of manufacturing flour and other mill products for sale.    A part of the mill building was used for the storage of wheat belonging to the company, and such as it might receive from the neighboring farmers.    The wheat so stored was all mixed in one common mass, from which the company drew from day to day for the purpose of its business.    In September, 1894, one E. D. Barrett delivered to it some 2,198 bushels of wheat, for which a receipt in the following form was issued to him:

"Red Crown Mills.

No. 1078.            Albany, Oregon, Sept. 18, 1894.

Received of E. D. Barrett, by self, two thousand one hundred ninety-eight 15-60 bushel No. 1 merchantable

wheat, subject to sacks and storage .08 cents per bushel, if withdrawn from mill.

                    RED CROWN ROLLER MILLS.
2198  15-60 Bu.                              Lyons."

Immediately upon the receipt of the wheat, it was, with the knowledge and consent of Barrett, mixed and mingled with the other wheat on hand at the time, and was subsequently manufactured into flour by the mill company, and sold for its own use and benefit. No storage was paid or demand made for the wheat until after the failure of the company in March, 1895, when Barrett demanded the then market value thereof, which being refused, he tendered the storage, and demanded a return of the wheat, and obtaining neither, commenced this prosecution.

The indictment charges that the defendant, as the manager of a warehouse for the storage of grain, received for storage therein the wheat in question, issued a receipt therefor, and afterwards sold, shipped, transferred, and removed the same from such warehouse, and beyond his control, without the written assent of the holder of the receipt. In order to sustain this charge it was incumbent upon the State to prove that the wheat in question was in fact placed in a warehouse, within the meaning of that term as used in the statute, and, in addition thereto, that it was placed therein on storage. A failure of proof in either particular would necessarily be fatal to the prosecution. Upon its face the receipt issued to Barrett affords no solution of either of these questions, for it is silent as to whether the building was in fact a warehouse, and as to whether the wheat was received on storage, or for some other purpose; and therefore resort could be had to parol evidence to ascertain the true character of the business in which the mill company was engaged, as well

as the terms on which the wheat was received:  *Lyon* v.
*Lenon,* 106 Ind. 567 (7 N. E. 311).  Upon the trial evidence
was given and offered tending to show, and from which
the jury could have found, that the mill company did
not receive grain for storage or safe keeping, but that,
according to its usual course of business, known to its
customers, and particularly to Barrett, all wheat received
by it was mixed with and became a part of the consumable
stock of the mill, and was manufactured into flour and
other mill products, and sold and disposed of by the mill
company in the usual course of business, and that it satis-
fied its obligation to the depositors by paying them the
market price when demanded, or by returning a like quan-
tity and quality of other wheat.  In the former case no
storage was charged or paid, but in the latter a charge of
eight cents a bushel was made for sacks and storage, and
this accounts for the provision in the receipt to Barrett
concerning the payment of storage if the wheat should be
withdrawn from the mill.  Assuming these facts to be
true, as we must for the purposes of this appeal, the ques-
tion of law is presented as to whether the transaction
comes within the provisions of the act of 1885.  And, as
its solution involves the merits of the entire theory upon
which the cause was tried in the court below, we shall
proceed to examine it without encumbering the opinion
with a statement of the various ways in which the question
was raised during the progress of the trial.  It is conceded
by counsel for the State, as we understand them, that if,
assuming the facts stated to be true, the corporation of
which defendant was the manager was not engaged in
the warehouse business, or if the wheat was not received
on storage, within the meaning of the statute, the judg-
ment from which this appeal was taken is erroneous, and
should be reversed.

The statute in question (Laws 1885, p. 61; 2 Hill's

Code, §§ 4201-4207) is entitled "An act to regulate warehousemen, wharfingers, commission men, and other bailees, and to declare the effect of warehouse receipts," and makes it the duty of every person owning or operating "any warehouse, commission house, forwarding house, mill, wharf, or other place where grain, flour, pork, beef, wool, or other produce or commodity is stored," to deliver to the owner thereof a warehouse receipt, which "shall bear the date of its issuance, and shall state from whom received, the number of sacks, if sacked, the number of bushels or pounds, the condition or quality of the same, and the terms and conditions upon which it is stored"; prohibits the issuance of fraudulent receipts, or for a commodity "not actually in store at the time of issuing such receipt"; prohibits the bailee from mixing commodities of different qualities or grades; provides that no person operating "any warehouse * * * or other place of storage" shall sell, encumber, ship, transfer, or remove beyond his custody or control, any grain or other produce for which a receipt has been given by him, without the written consent of the holder of the receipt; makes all checks or receipts given by any person operating "any warehouse * * * or other place of storage" for any grain or other commodity "stored or deposited," and all bills of lading and transportation receipts of any kind, negotiable; provides that the same may be transferred by indorsement, which shall be deemed a valid transfer of the commodity represented thereby; that on the presentation of the receipt given by any person operating "any warehouse * * * or other place of storage" for grain or other produce, and payment of all the charges due thereon, the owner shall be entitled to the immediate possession of the "commodity named in the receipt"; that it shall be the duty of the warehouseman or bailee to deliver the same to him; and the violation of any provision of the act is

thereby made a penal offense, punishable by fine or imprisonment, or both.

From this summary it is apparent that the statute, as its title and contents clearly indicate, is designed to cover the special business of warehousemen, wharfingers, commission men, and other bailees who are engaged in receiving and storing the goods of others as a business. Its principal object is to make warehouse receipts negotiable, and to protect the rights of the holders thereof, by requiring the warehouseman or bailee to keep constantly on hand the specific goods stored, or a sufficient portion of the bulk of which they become a part, to satisfy his outstanding receipts. In short, it was designed to compel a warehouseman or other like bailee, under the penalties of a criminal prosecution, to live up to and abide by the contract of bailment. But the evil sought to be remedied by this legislation and the remedy sought to be applied alike show that it never was within the legislative mind that it should apply to a case where the bailee has the right, under the contract, express or implied, to sell or use the goods committed to his care. In such case, in the very nature of things, there can be no storage or bailment; but the transaction is, in essence, a sale of the commodity, and an extension of personal credit to the bailee. There is an inherent difference recognized by all the authorities between a bailment and a sale. In the one case the property remains in the depositor, and the bailee is but the custodian of the thing, with no right to use or dispose of it in any way; while in the other he may use it as his own, the depositor relying upon his personal credit for its value either in money or kind. A warehouse, therefore, within the meaning of this statute, is a place where any of the commodities enumerated therein is received on storage for the owner, by some person or corporation engaged in the general business of receiving such goods in store for com-

pensation or profit: *Bucher* v. *Commonwealth,* 103 Pa. St. 528; *Fishback* v. *Van Dusen,* 33 Minn. 111 (22 N. W. 244); *State* v. *Bryant,* 63 Md. 66.

Under the rule in this state, wheat stored with a warehouseman does not cease to be a bailment, within the meaning of this act, because it is by the consent of the depositor mixed with other wheat of like grade and quality: *McBee* v. *Caesar,* 15 Or. 62 (13 Pac. 652). But when it is delivered and received under an agreement, express or implied from the course of dealing, that the person to whom it is delivered may use it as a part of his consumable stock, and fulfill his obligation to the owner by either paying its market value when demanded or returning an equal amount of other wheat of like grade and quality, the transaction is not a bailment or storage, within the meaning of the statute, and the depositee cannot be convicted of a crime for doing that which he is permitted to do by the very terms of his contract: *Lyon* v. *Lenon,* 106 Ind. 567 (7 N. E. 311); *McCabe* v. *McKinstry,* 5 Dillon, 509 (Fed. Cas. No. 8, 667); *Andrews* v. *Richmond,* 34 Hun. 20; *Johnston* v. *Browne,* 37 Iowa, 200; *Nelson* v. *Brown,* 44 Iowa, 455. Now, as already suggested, there was evidence in this case tending to show (1) that the company of which the defendant was the manager was not engaged in the business of receiving grain on storage for the owner, and so was not a warehouse-keeper within the meaning of the statute; and (2) that, if it was keeping a warehouse for the storage of grain, the Barrett wheat was not so received. The case, therefore, should have been submitted to the jury with a direction that they could not convict unless they were satisfied from the evidence that the place where the grain was deposited was in fact a warehouse for the storage of grain, and that it was received there on storage, and not on an agreement, express or implied, that the mill company might use it in

the course of its business.  And because these questions were not so submitted to the jury, the case must be reversed and a new trial ordered.

REVERSED.

JUSTICE WOLVERTON took no part in this decision.

Argued April 14; decided October 19, 1896; rehearing denied.