Argued 24 March; decided 21 April, 1902.

## TOBIN *v.* PORTLAND MILLS CO.

[68 Pac. 743, 1108.]

NUMEROUS PARTIES—SUIT BY PART ON BEHALF OF ALL.

1. Ten out of a hundred persons jointly interested in a fund cannot bring a suit on behalf of all, under Section 385 of Hill's Ann. Laws, to recover and distribute such fund, where as many as thirty-four of the interested parties state in court that they are not willing to contribute to the expense of the suit. To such a suit all those entitled to share in the fund are necessary parties, and should be brought in as plaintiffs or defendants.

AFFIDAVITS AS EVIDENCE—HEARSAY.

2. In a suit by depositors of wheat in a warehouse to compel an accounting for wheat delivered by the warehouseman to defendants without the consent of the depositors, affidavits of the depositors as to the deposit, amount, and authority to remove or dispose of the wheat, made on *ex parte* examinations, and without opportunity of defendants to cross-examine, are hearsay, and inadmissible in evidence.

TENANCY IN COMMON OF WHEAT—RECEIPT STUBS AS EVIDENCE.

3. Where, in a suit by depositors of wheat in a warehouse to compel an accounting for wheat shipped by the warehouseman to defendants, without the depositors' authority, it appeared that the amount bought by defendants was more than the amount belonging to the depositors and unaccounted for, but such excess was commingled with the depositors' wheat, the defendants were tenants in common with the depositors, and parties to the transactions recorded in the warehouseman's receipt book containing the stubs of the receipts issued to the depositors, rendering them admissible in evidence as books of original entry.

HARMLESS ERROR IN ADMITTING EVIDENCE.

4. A careful examination of the evidence has satisfied the court that the error of the trial judge in admitting in evidence certain affidavits was harmless.

BAILMENT—LIABILITY OF PURCHASER.

5. Though a warehouseman in whose warehouse wheat was deposited purchased it whenever the depositors chose to dispose of it, and shipped it, and the agents of those to whom it was shipped believed he had authority to dispose of wheat delivered to them, such persons obtained no title to wheat delivered to them without the authority of the depositors, and should account to the depositors for the wheat for which they are legally responsible, in proportion to that part of the deficiency which they severally caused.

DEPOSIT WITH WAREHOUSEMAN—BAILMENT—SALE.

6. Where owners of wheat delivered it to a warehouseman, receiving either warehouse receipts reciting the receipt of wheat subject to warehouse charges for sacks and storage at a certain sum per bushel, and stored at owner's risk of loss by fire, or load checks reciting the receipt of wheat stored at owner's risk unless specially insured,—the owners expecting either to sell to the warehouseman, or secure the return of a like quantity and quality of wheat upon demand and payment of the storage charges,—the deposits were not sales, instead of bailments, and did not pass title to the warehouseman.

From Linn:  REUBEN P. BOISE, Judge.

This is a suit by Ida M. Tobin, Mary Black, H. C. Davis, W. H. Gulliford, B. F. Allen, James A. Smith, John Davis, John M. Porter, Alexander Powers, and Robert Andrews against the Portland Flouring Mills Co. and the Salem Flouring Mills Co., corporations, Stephen Williamson, Robert Balfour, Robert B. Foreman, Alexander Guthrie, Robert Bruce, and Walter J. Burns, partners as Balfour, Guthrie & Co., and James C. Black as administrator of the estate of Thomas J. Black, deceased, to compel the defendants to account for wheat received from Black.

It is alleged in the complaint, in substance, that plaintiffs bring this suit for themselves and all others similarly interested, whose consent to become parties plaintiff could not secure, because of their number; that Thomas J. Black died intestate November 29, 1899, and the defendant James C. Black was appointed administrator of his estate, who duly qualified and entered upon the performance of his trust; that Black, at the time of his death, and for about three years prior thereto, operated warehouses at Halsey and Cummings, in Linn County, and at Derry, in Polk County, during which time he received in storage as a warehouseman large quantities of wheat, for which he issued warehouse receipts and load checks; that at the time of his death there were outstanding receipts and checks for about 40,000 bushels of wheat stored at Halsey, of which all but about 15,000 were stored prior to 1899, and for wheat at the Cummings and Derry warehouses 16,000 and 20,000 bushels, respectively; that the wheat so stored was in part sacked, and the remainder in bins, and that the title thereto was in the plaintiffs and other depositors, who at no time gave their consent to remove any part of said grain; that at the time of Black's death there were stored at Halsey about 27,000 bushels, at Cummings 18,000, and at Derry 20,000 bushels, aggregating 58,000 bushels of wheat, which quantity lacked about 13,000 bushels of meeting the demands of those holding receipts and load checks; that the decedent while operating these warehouses shipped from time to time large quantities of wheat therefrom to the defendants, without the

knowledge or consent of the plaintiffs, or other depositors, and at the time of his death there were and now are held in store by the Portland Flouring Mills Co. at Oregon City 9,296 29-60 bushels, by Balfour, Guthrie & Co. 2,446 20-60 bushels, and by the Salem Flouring Mills Co. at Salem 3,977 45-60 bushels of this wheat, the property of the plaintiffs and of those for whom this suit is instituted; that, prior to the commencement thereof, plaintiffs demanded said wheat of the defendants, but they refused to deliver any part of it; that plaintiffs cannot state how much wheat was shipped by Black to the defendants, respectively, in 1899, nor how much during the preceding years, nor how much of the loss, if any, should be sustained by the depositors, nor can they do so until a complete accounting has been made.

Plaintiffs further allege, upon information and belief, that the three buildings were conducted as one warehouse, and that the decedent paid those of the depositors who from time to time sold grain to him out of the proceeds of grain shipped indiscriminately from said warehouses; that the estate of intestate is insolvent, and unless the plaintiffs and those in behalf of whom suit is instituted can trace the grain so shipped, and now in the possession of said defendants, and wrongfully withheld by them, they are without remedy; that there are from 100 to 250 depositors who hold receipts and load checks for wheat stored in said warehouses, and that it would be impracticable, and necessitate as many suits as there are depositors, to ascertain the amount of the loss, and how much each should sustain in case the defendants are permitted to retain the wheat so delivered to them; and that a receiver should be appointed to take charge of said warehouses, in order to protect the rights of the several depositors.

A demurrer to the complaint on the ground of nonjoinder of parties plaintiff and misjoinder of parties defendant, improper joinder of causes of suit, and that the complaint did not state facts sufficient to constitute a cause of suit, having been overruled, the defendants the Portland Flouring Mills Co. and the Salem Flouring Mills Co. answered separately,

denying the material allegations of the complaint, but admitting that they had received the quantities of wheat alleged in the complaint, on account of which they had made advances, and averring that, without knowledge or notice that any other than Black had any right to said wheat, they acted in good faith, and allege that he was the owner thereof, and had authority to ship the same, and to give liens thereon for said advances. For a second defense it is alleged that Black was engaged in purchasing and selling grain in pursuance of a general and well established custom among warehousemen in Linn and Polk counties, to remove the wheat and renovate the warehouse once a year, as was well known to the depositors, who acquiesced therein, and Black had power and authority to remove said wheat, and was vested with an apparent title to it; that defendants dealt with Black in good faith, believing that he was the owner of said wheat, and had title to it and power of disposing of the same, for which reasons the plaintiffs ought not to be permitted to assert any claim thereto, except subject to the liens for such advances. It is also alleged that the defendants are distinct corporations, having no connection with each other, nor with the defendants, Balfour, Guthrie & Co., and that the plaintiffs and those on whose behalf this suit was instituted are not united in interest. The cause of suit as to Balfour, Guthrie & Co. was afterward dismissed.

Replies put in issue the allegations of new matter in the answers, whereupon a trial was had, and the testimony taken, from which the court found that there were at the time of Black's death outstanding receipts and checks for wheat received and stored at the warehouse at Halsey, 40,881 bushels, belonging to 101 depositors, stating their names, and giving the quantity of wheat deposited by each; that Black had shipped from said warehouse without the consent of the depositors 11,475 53-60 bushels of wheat, leaving only 29,306 47-60 bushels; that, of the wheat so shipped, the Portland Flouring Mills Co. received 8,424 bushels, and the Salem Flouring Mills Co. 3,051 54-60 bushels, of the value of 49 cents per bushel,—and decreed that the plaintiffs recover from the Portland Flour-

ing Mills Co. $4,126.76, and from the Salem Flouring Mills Co. $1,495.20, to be paid into court for distribution by the receiver among the plaintiffs and those for whose benefit the suit was instituted, as the court should thereafter determine. From which decree the Portland Flouring Mills Co. and the Salem Flouring Mills Co. appeal.                          Reversed.

For appellants there was a brief over the names of *Williams, Wood & Linthicum,* and *Sanderson Reed,* with an oral argument by *Mr. Reed,* and *Mr. Stewart B. Linthicum.*

For respondents there was a brief and an oral argument by *Mr. Jas. K. Weatherford,* and *Mr. J. R. Wyatt.*

Mr. Justice Moore, after stating the facts, delivered the opinion of the court.

1. It is contended by appellants' counsel that the depositors of wheat in the warehouses are not so numerous as to entitle the plaintiffs to represent them, and that the court erred in decreeing a recovery of any wheat, or of the value thereof, in favor of any person other than the plaintiffs. That part of the decree which requires the appellants to pay into court the sums awarded, to be distributed by the receiver to those for whose benefit the suit was instituted, is sought to be justified by invoking Section 385, Hill's Ann. Laws, which is as follows: "Of the parties to the suit, those who are united in interest must be joined as plaintiffs or defendants; but if the consent of any one who should have been joined as plaintiff cannot be obtained, he may be made a defendant, the reason thereof being stated in the complaint; and when the question is one of common or general interest of many persons, or when the parties are very numerous, and it may be impracticable to bring them all before the court, one or more may sue or defend for the benefit of the whole." The averment of the complaint calling this statute into requisition is as follows: "The plaintiffs, for cause of suit against the defendants, allege that they

bring this suit in their own names for themselves and on behalf of all others similarly situated and interested in the subject-matter of the suit; and plaintiffs allege, and it will more fully appear from the allegations of the complaint hereinafter contained, that it is impracticable to unite all the parties in interest herein, because they are too numerous, and scattered over such an expanse of territory that their consent to the institution of this suit cannot be first had and obtained.'' The wheat so deposited in the warehouse when commingled belonged to the depositors, who were tenants in common thereof, having such an undivided interest therein as the quantity stored by each bore to the amount deposited: *Brown* v. *Northcutt*, 14 Or. 529 (13 Pac. 485) ; *Hamilton* v. *Blair*, 23 Or. 64 (31 Pac. 197). If Black shipped to the appellants any of the wheat that belonged to the depositors, without their consent whereby a deficiency occurred in the quantity so commingled, rendering it impossible for a depositor to show the extent of his loss, a court of equity could afford relief by bringing all the parties before it, and doing complete justice between them, by ascertaining the deficiency in the joint property, and decreeing a recovery of the grain, if it could be discovered, or, failing in that respect, apportioning the loss *pro rata* among the joint owners: *Dole* v. *Olmstead*, 36 Ill. 150 (85 Am. Dec. 397) ; *Greenleaf* v. *Dows* (C. C.), 8 Fed. 550.

The right of the plaintiffs to maintain this suit for all the parties interested in the subject-matter is based on the averment of the complaint to the effect that the depositors are so numerous as to render it impracticable to bring them all before the court. It is a familiar rule in equity that the rights of no person shall be adjudicated unless he is present or given an opportunity to be heard, and that, when a decree is rendered affecting any subject-matter, the rights of all persons immediately interested therein shall be protected as far as they reasonably may be. Judge Story, in his work on Equity Pleading (9 ed.), § 72, in speaking upon this subject, says: ''It is the constant aim of courts of equity to do complete justice, by deciding upon and settling the rights of all persons interested in

the subject-matter of the suit, so that the performance of the decree of the court may be perfectly safe to those who are compelled to obey it, and also that future litigation may be prevented. Hence the common expression that courts of equity delight to do justice, and not by halves.'' Courts of law require no more parties to an action than those immediately interested in the subject-matter, but in equity all persons, including those remotely interested therein, may be joined, and are often necessary parties: Story, Eq. Pl. § 76. The same author, speaking of certain deviations from the rule, says: ''The most usual cases arranging themselves under this head of exceptions are (1) where the question is one of a common or general interest, and one or more may sue or defend for the benefit of the whole; (2) where the parties form a voluntary association for public or private purposes, and those who sue or defend may fairly be presumed to represent the rights and interests of the whole; (3) where the parties are very numerous, and although they have, or may have, separate, distinct interests, yet it is impracticable to bring them all before the court'': Story, Eq Pl. § 97. Section 385, Hill's Ann. Laws, is a copy of section 119 of Howard's New York Code, except the word ''suit'' in the copy takes the place of the word ''action.'' In *McKenzie* v. *L'Amoureaux,* 11 Barb. 516, Mr. Justice HARRIS, commenting upon the exceptions spoken of by Judge Story, and explaining the adoption of the section of the code adverted to, says: ''So far was the legislature from intending any change in the rule on this subject, that, in making the great changes contemplated by the adoption of the code, it was careful to preserve this convenient practice of the court of chancery. The code commissioners had reported a section, copied substantially from one of the rules of the Supreme Court of the United States, providing that those who are united in interest must be joined as plaintiffs or defendants, except that, if the consent of any one who should have been joined as plaintiff cannot be obtained, he may be made a defendant, the reason thereof being stated in the complaint. This, too, was the practice in the court of chancery. The legis-

lature adopted the provision thus reported, but added to the section as follows: 'And when the question is one of common or general interest of many persons; or when the parties are very numerous and it may be impracticable to bring them all before the court, one or more may sue or defend for the benefit of the whole': Code, § 119.   This was also in accordance with the then existing practice of the courts of equity.   The legislature seems to have apprehended that by adopting the rule reported by the commissioners it might be understood to have rejected the kindred rules embraced in the latter clause of the section.   To prevent this misapprehension the latter clause was added, thus retaining in the new practice the same rules by which to determine whether the proper parties were before the court which then prevailed in the court of chancery.''

The latter clause of Section 385 of Hill's Ann. Laws, in effect, enacts the third exception to the rule in equity, in respect to the necessity of making all persons immediately interested in the subject-matter parties, omitting therefrom, however, the words, ''and although they have, or may have, separate, distinct interests.''   This omission cannot mean that the legislative assembly intended thereby to limit the third exception to cases in which the very numerous parties mentioned had a joint and indivisible interest in the subject-matter of the suit, for to give the statute such construction would render the exception superfluous, as the preceding clause of the section extends the second exception to that very class of parties, but limits it to a less number.   It is manifest that the language so omitted was explanatory only, and is implied from the first exception in the statute, thus rendering the words omitted unnecessary; and hence the statute, instead of amending the exceptions to the rules of equity in respect of parties is a legislative recognition thereof.   The decisions of the courts of equity must be examined to determine when these statutory exemptions are applicable.   Judge Story, in speaking of the third exception to the general rule of equity in respect of parties, where they are very numerous, says: ''In this class of cases there is usually a privity of interest between the parties,

but such privity is not the foundation of the exception. On the contrary, it is sustained in some cases where no such privity exists. However, in all of them there always exists a common interest or a common right, which the bill seeks to establish and enforce, or a general claim or privilege, which it seeks to establish or to narrow or to take away. It is obvious that under such circumstances the interests of persons not actual parties to the suit may be in some measure affected by the decree, but the suit is nevertheless permitted to proceed without them, in order to prevent a total failure of justice'': Story, Eq. Pl. (9 ed.) § 120. Mr. Pomeroy, in his work on Code Remedies (3 ed.), § 389, in commenting upon the second statutory exemption, almost identical with the third exception to the general rule of equity in respect to parties, says: ''The second case depends entirely upon the number of persons who should, according to the ordinary rule, be plaintiffs or defendants. The single essential element is the impracticability of bringing all the parties before the court, on account of their great number. The language does not in terms require any question of common or general interest to this great number, but it is difficult to conceive of an action in which a very large number of persons should be capable of joining as plaintiffs,—so large that it would be impracticable to bring them all actually before the court,—unless the question to be determined was one of common or general interest to them all. It evidently follows, therefore, from the customary nature of litigations, that these two cases described by the statute are in practice constantly united. They constantly run into each other. In fact, it seldom if ever happens that a suit arises which falls strictly within the terms of the second case, and not within those of the first.''

If it is to be assumed that each depositor had such a common interest in the wheat alleged to have been shipped by Black to the defendants, so that the plaintiffs were competent to represent them, and were authorized to institute and prosecute this suit in their behalf, and conceding that 101 depositors, by reason of an exercise of the court's discretion, come within the

designation of "very numerous parties," the question to be considered is whether it was impracticable to bring them all before the court. Each depositor made a voluntary affidavit, which was admitted in evidence over the defendant's objection and exception, showing the quantity of wheat he had stored in Black's warehouse at Halsey, and 35 of the depositors appeared as plaintiff's witnesses at the trial, several of whom testified that they were anxious to share in the results of the suit, if the wheat shipped to the defendants, or its value, could be recovered, but only one depositor expressed a willingness to bear any part of the expenses incident to the suit. The others who were interrogated on this subject either declined to answer the question, or denied any intention to bear any part of such expenses. A person materially interested in the subject-matter of a suit may, against his will, be made a party defendant, but we know of no rule whereby he can, without his consent, be joined as plaintiff. The desire of a person to be joined as a party plaintiff is indicated by a willingness to bear his share of the expenses of the trial, and while 35 of the depositors were anxious to participate in the profits of the suit, if any were realized, 34 of them, tacitly, at least, expressed their unwillingness so to contribute, thereby manifesting their dissent to being joined as plaintiffs, notwithstanding which a decree is given in their favor; thus, in effect, making them parties plaintiff against their will. Besides this, the 101 depositors, having made voluntary affidavits of their respective claims for wheat deposited at Black's warehouse at Halsey, could, if they so desired, have expressed their assent to be joined as plaintiffs, thereby demonstrating the practicability of bringing them all before the court. If the depositors had not been interrogated in respect to their willingness to pay their part of the expenses, the law would probably have presumed that, as they were anxious to secure their share of the grain alleged to have been shipped to the defendants, they were also willing to contribute their part of the expenses incurred in recovering it, or its value; but their testimony dispels such presumption, if it could ever have been invoked.

Judge Story, in his work on Equity Pleading (9 ed.), § 135a, in speaking of making all persons materially interested in the subject-matter parties, says: "When all the persons in interest can be made parties, and the decree must affect their interest, there seems to be a sound reason for insisting upon a strict adherence to the rule." In the case at bar the decree necessarily affects all the depositors, and, as they could have been made parties to the suit, the court erred in overruling the demurrer interposed on that ground, and in failing to bring before it all the depositors.

2. It will be remembered that the plaintiffs were permitted, over defendants' objection and exception, to introduce in evidence the voluntary affidavits of the depositors, of which the following is a sample:

"53.                                          No. 1.

STATE OF OREGON, ⎱ ss:
  County of Linn. ⎰

I, H. C. Davis, being first duly sworn, say that there was placed on storage by or for me in the warehouse operated by T. J. Black, deceased, at Halsey, in the County of Linn, State of Oregon, during the season of 1899, 1,302 55-60 bushels of wheat, and that I hold load checks issued therefor by the said T. J. Black; that I have not withdrawn any portion thereof, except —— bushels, and that I have not sold or transferred any portion thereof, except———bushels, and that I have now stored 1,302 55-60 bushels thereof in said warehouse, belonging to me; that I have never at any time authorized said T. J. Black, or any one, in writing or otherwise, to ship or remove said wheat, or any portion thereof, out of said warehouse, or to pledge or hypothecate or otherwise dispose of the same, or any part thereof, to any person whomsoever.

H. C. DAVIS.

Subscribed and sworn to before me this 21st day of February, 1900.                               J. C. STANDISH,
[SEAL]                            Notary Public for Oregon."

These affidavits were made on *ex parte* examinations of the depositors to subserve their own interests, and, as the defendants had no opportunity to cross-examine the deponents, their

declarations are hearsay, and were inadmissible in evidence; Greenl. Ev. § 124; 2 Jones, Ev. § 302.

The transcript shows that Thomas J. Black, from 1897 to 1899, inclusive, operated grain warehouses at Halsey and Cummings, in Linn County, and during the seasons of 1898 and 1899 at Derry, in Polk County, Oregon, receiving wheat for storage therein from neighboring farmers and others, for which, upon their request, he issued warehouse receipts, of which the following is a copy:

"T. J. Black's Warehouse,
                    Halsey, Oregon, September 28, 1899.
123 50-60 bushels.

Received of A. B. Paxton by J. H. Redham on storage, one hundred twenty-three 50-60 bushels of red wheat. Subject to warehouse charges for sacks and storage at 7 cents per bushel from date to June 1st, 1900.

Stored at owner's risk of loss by fire.
No. 106.                              T. J. Black."

There is indorsed on the receipt the following memorandum:

"Received of A. Wheeler, of the within wheat, 85 27-60 bush."

J. N. Duncan, as the agent for A. B. Paxton, makes an affidavit for his principal in which he sets out a copy of said receipt, and deposes as follows: "That, as agent of said A. B. Paxton, I have said receipt in my posssesion; that said A. B. Paxton is still the owner of the said wheat specified in said receipt, and has never transferred the same, or any part thereof, to any one; that there are no charges or counterclaims against the same, to my knowledge, other than the said storage as set out in said receipt." Black's wheat ledger for 1899, having been offered in evidence, shows that there were stored in his warehouse at Halsey, on Paxton's account, 123 50-60 bushels, for which said receipt was issued, but the ledger does not contain any memorandum of the wheat withdrawn, as apparently evidenced by the indorsement on the receipt. A. B. Paxton's name appears in the decree as one of the deposi-

tors of wheat at Halsey, and there are awarded to him 123 50-60 bushels, which quantity helps to make up the 40,881 bushels found by the court to have been deposited in that warehouse,—evidently an error of 85 27-60 bushels. It is quite probable that this wheat was withdrawn after the affidavit was made, and the indorsement on the receipt escaped the attention of the court.

3. Black's warehouse receipt book was offered in evidence, and the stubs therein show that from 1897 to 1899, inclusive, there were issued for grain at Halsey quite a number of receipts, only three of which were offered in evidence. The other two were issued to J. K. Weatherford and to Lyman Palmer for 70 15-60 and 578 bushels of wheat, respectively, and bear no indorsement of withdrawal. A comparison of said stubs with the ledger shows that 16 receipts, besides those adverted to, appear to be· outstanding. These receipts, upon demand therefor, were issued upon a surrender of, and in exchange for, load checks, of which the following is a sample:

"No. 142.                     HALSEY, Or., Aug. 19, 1899.
               T. J. BLACK'S WAREHOUSE.
Mr. P. A. Starr, by — — — by 30 sacks, 58 bush. 30 lbs. wheat. By sacks empty — — —. To sacks trailings. Received by W. H. McMahon.

Grain is stored at owner's risk, unless specially insured. See that proper number of sacks, including empties, are entered on your check.
                     NOT TRANSFERABLE."

The transcript shows that, when wheat was delivered, load checks were issued, and duplicates thereof kept in stubs, from which the account of each depositor was transferred to Black's ledger. These stubs were admitted in evidence over the appellants' objection and exception, and it is maintained that an error was thus committed; the argument being that the appellants were not parties to any of the transactions therein recorded. It will be remembered that the Portland Flouring Mills Co. and the Salem Flouring Mills Co. had received from Black in 1899 9,296 26-60 and 3,977 45-60 bushels, re-

spectively, or 13,274 14-60 bushels of wheat, while the total deficiency for the several years is only 11;275 53-60 bushels, thus showing that the appellants secured a title to 1,798 21-60 bushels. This quantity, however, being commingled with the depositor's wheat, made the appellants tenants in common with them, and parties to the transactions recorded in the stubs of the check books, rendering them admissible in evidence as books of original entry.

4. The testimony shows that A. Wheeler, having been appointed receiver, took charge of said warehouses, and caused the wheat at Halsey to be weighed; and from his testimony the court found that at the time of Black's death, to wit, November 29, 1899, there were in store only 29,306 47-60 bushels; that Black had caused to be removed from the Halsey warehouse, without the depositor's consent, 11,475 53-60 bushels; and that there were due the depositors 40,881 bushels; thus showing an error in the computation of 98 20-60 bushels. A comparison of the findings of the court in respect to the quantity of wheat due the several depositors and Black's ledger shows an overallowance, in pounds, as follows: Wm. L. Uber, 30; Hugh Cummings, 10; Hugh Leeper, 30; D. H. Ambrose, 33; Joseph Webber, 10; and J. C. Bramwell, 10. By the same method it is discovered that George C. Simon and Daniel McClain should have been allowed 1 bushel each, and Peter Long 40 pounds, more than was awarded them; and these corrections, with the overallowance to Paxton, leave only 13 30-60 bushels unaccounted for, thus apparently demonstrating the accuracy of the computation, and conclusively showing that, while the affidavits to which reference has been made were improperly admitted in evidence, no material injury resulted therefrom.

5. The testimony also shows that the depositories in question were not operated by Black as one warehouse, and that the wheat received by Balfour, Guthrie & Co. was shipped from Derry, and on account thereof this suit was dismissed as to them. It also appears that no wheat had been shipped from Cummings, whereby the deficiency is located at the warehouse

at Halsey from which wheat was shipped to the appellants, and that at the time this suit was instituted, to wit, December 27, 1899, the Portland Flouring Mills Co. had received at Oregon City from Black, and then had on deposit, 9,296 29-60 bushels, on account of which it had advanced to him the sum of $5,711.38, and that the Salem Flouring Mills Co. had received from him at Salem 3,977 46-60 bushels of wheat, on account of which it had advanced to him $2,110.16. The greater part of the wheat so delivered to the latter corporation was destroyed by fire, and at the time this suit was begun there remained only 750 6-60 bushels, but said corporation collected from insurance companies the loss on the wheat so destroyed. The testimony discloses that, whenever the depositors chose to dispose of their wheat, Black purchased it, and shipped it to market on his own account; and, while the agents of the appellants undoubtedly believed that he had authority to dispose of the wheat delivered to them, we are satisfied that he had no title thereto, and that they should account for the wheat for which they are legally responsible. The testimony further shows that there should have been in store at Halsey certain quantities of wheat that had been deposited in 1897, 1898, and 1899, while the deficiency for the latter year is only 3,869 36-60 bushels. If Black during these years shipped wheat to no other persons or corporations than the appellants, they ought to account to the depositors for the entire deficiency, but only in proportion to that part of it which they severally caused. We think the testimony fails to show such an accounting as legally to charge the appellants with the quantities of wheat which the court finds they severally converted; but, believing that further proof upon this branch of the case can be adduced, we deem it proper, in consequence of the lack of interested parties (*Wheeler* v. *Lack*, 37 Or. 238, 61 Pac. 849), to send the case back, with instructions to bring in all those who are materially interested in the suit, to take additional testimony, and enter a decree in accordance therewith.

6. It is contended by appellants' counsel that the evidence

discloses that the deposits of wheat in Black's warehouse at Halsey constituted sales, and not bailments, and, this being so, the depositors had no title to or interest in the wheat delivered to the appellants, and that the court erred in decreeing the recovery of any sum as the value thereof. An examination of the receipts and load checks issued as evidence of such deposits does not show that the grain was sold to Black; nor is such a conclusion, in our opinion, supported by the testimony, which is to the effect that the depositors expected either to sell to him, or to secure the return of a like quantity and quality of wheat upon demand, and the payment of the storage charges, and that they had in most instances sold the wheat to him when they desired to dispose of it. The testimony fails to show, as in *State* v. *Stockman*, 30 Or. 36 (46 Pac. 851), that the wheat was delivered and received under an express agreement, or implied from the course of dealing, that Black might dispose of any part of it, and fulfill his obligation to the depositors by either paying its market value, or returning an equivalent quantity of wheat upon demand. The depositors did not, in our opinion, intend to part with the title to their wheat by placing it in the warehouse; and such intention is not inferable from the fact that they expected at some subsequent time either to sell the wheat to him, or to secure a like quantity and quality when desired. In view of another trial, we have deemed a consideration of the questions commented upon important.

Upon the payment by the plaintiffs of the defendant's costs on this appeal within sixty days, the decree will thereupon be reversed, and the cause remanded to the court below, with leave to the plaintiffs to apply to that court for permission to amend their complaint by joining such depositors as may desire to come in, and by making all others parties defendant, omitting Balfour, Guthrie & Co., and the averment that said depositories were operated as one warehouse, and for such further proceedings as may seem proper, not inconsistent with this opinion; otherwise the complaint will be dismissed without prejudice.        REVERSED.

Decided 26 May, 1902.

SUPPLEMENTARY OPINION.

MR. JUSTICE MOORE delivered the opinion.

Since the opinion in this case was handed down, our attention has been called to the fact that the appellants did not consent to the dismissal of the suit as to Balfour, Guthrie & Co., and, as the transcript discloses that they received wheat from Black that was stored at Halsey, nothing that is said in the opinion was intended to prevent interested parties from having said company, or other persons who may have received wheat from the warehouse at that place, brought in as parties hereto, and required to account for the portion thereof converted by them, respectively.                         REVERSED.

Decided 21 April, 1902.