Argued February 21, reversed October 24, 1950, petition for
rehearing denied January 10, 1951

# INVESTMENT SERVICE CO. *v.* O'BRIEN AND WEST COAST TERMINALS, INC.

223 P. (2d) 163

*James C. Dezendorf*, of Portland, argued the cause for appellant. With him on the brief were Koerner, Young, Swett & McColloch, and Harry J. DeFrancq, of Portland.

*Wilber Henderson* argued the cause for respondent. On the brief were Platt, Henderson, Warner, Cram & Dickinson, and John E. Huisman, of Portland.

Before LUSK, Chief Justice, and BRAND, BELT*, BAILEY and LATOURETTE, Justices.

LUSK, C. J.

As assignee of the United States Bank of Portland (Oregon) the plaintiff, Investment Service Co., an Oregon corporation, brought this suit in equity for the purpose of recovering a judgment on two promissory notes executed by the defendant, Neil J. O'Brien, doing business as Columbia Pacific Distributing Co., and of subjecting to the lien of such judgment 1600 boxes of Newtown apples claimed to be held in pledge to the bank by the defendant, West Coast Terminals, Inc., a corporation. The complaint prayed that the apples be sold and the proceeds applied to the satisfaction of

---

* Belt, J., died August 6, 1950.

the judgment against O'Brien. Defendant, West Coast (hereinafter called the defendant), in its answer alleged that the apples were delivered to it by O'Brien for shipment to Manila, P. I., and that they had been so shipped in accordance with instructions received by the defendant from General Steamship Company, acting for O'Brien. To this plaintiff filed a reply in which it alleged that, if the apples had been shipped as alleged, this was done without the authority or consent of plaintiff and in violation of its rights, and prayed for judgment against West Coast in the amount of $8,400.00, the value of the apples.

O'Brien defaulted. After a trial upon the issues between the plaintiff and defendant, judgment was entered against O'Brien upon the promissory notes in the sum of $5,000.00, with interest thereon at the rate of six per cent per annum from April 17, 1947, and the further sum of $2,500.00 with interest thereon at the rate of six per cent per annum from April 21, 1947; and the further sum of $750.00, attorneys' fees, and plaintiff's costs and disbursements; and against the defendant in the sum of $8,400.00, found to be the value of the apples, payment thereof to be credited pro tanto upon the judgment against O'Brien. The defendant has appealed.

The case for the plaintiff is based upon the terms of a written instrument delivered by the defendant to O'Brien and by him in turn delivered to the Bank. This instrument is on a printed form customarily used by the defendant in similar transactions, and reads as follows:

"NON NEGOTIABLE
RECEIVING MEMORANDUM
WEST COAST TERMINALS

Date 4-16-47                                   No. 189
Received from COLUMBIA PACIFIC
    DISTRIBUTING CO.
For account of U. S. NATIONAL BANK
For Shipment COLD STORAGE
In apparent good order except as noted:

No. Packages
1600

Description
Boxes Newtown apples
6 Boxes B/o
State of Oregon
No. 150

Hauled from Interstate Terminal
        /s/  WEST COAST TERMINALS
        By J. W. Schreiner.''

The circumstances are these: In January, 1946, O'Brien arranged with the Bank to borrow money on the basis of letters of credit to be issued in connection with shipments of merchandise by O'Brien to Manila, P. I. O'Brien executed with the Bank the usual form of collateral agreement to cover collateral to be hypothecated by O'Brien to the Bank from time to time as moneys were borrowed. Under this arrangement the Bank loaned various sums to him during the succeeding months. This case is concerned with two such loans made in April, 1947, one in the amount of $5,000.00, represented by a promissory note dated April 17, 1947, and the other in the amount of $2,500.00, represented by a promissory note dated April 21, 1947. Nothing has been paid on either note.

The ''Receiving Memorandum'', a copy of which has been set forth, was delivered to the Bank by O'Brien at the time that the $5,000.00 loan was made. As part

of the transaction O'Brien also delivered to the Bank various advices of credit notifying him of the establishment in favor of Columbia Pacific Distributing Co. of irrevocable credits with Manila banks in varying amounts for the account of named firms in Manila, and that drafts to be drawn against such credits should be accompanied by certain documents, among which were bills of lading, freight prepaid, covering shipments of apples. To illustrate, one such advice of credit from Seattle First National Bank, Seattle, Washington, dated April 2, 1947, stated that their correspondent, Philippine Bank of Communications, Manila, P. I., had opened their irrevocable credit No. 12724 in favor of Columbia Pacific Distributing Co. for account of Cheng Suey Beng, Manila, for an amount not exceeding $4,145.00; that drafts were to be drawn on Cheng Suey Beng, Manila, evidencing shipment of *"500 cases* Stadelman Hood River Brand Newton Apples". The other letters of credit covered the remaining 1100 cases of apples and were in similar form. O'Brien drew, and left with the Bank, drafts to the full amount of the various letters of credit, and deposited with the Bank the other documents required except the bills of lading. These the Bank never received. The letters of credit expired under the time limitations stated in them. The apples were shipped. Upon their arrival in Manila apparently no one claimed them and they were sold to pay the freight charges.

The transaction between O'Brien and the defendant had its inception in the fore part of April, 1947, when O'Brien advised R. L. Boone, district manager of the defendant, that he had apples on another dock which had been booked on the vessel "Silverteak", which was operated under the agency of the General Steamship

Corporation, and asked Boone if he would put the apples in defendant's refrigerating plant pending arrival of that ship. Mr. Boone ascertained from the General Steamship Corporation that the booking had been made and asked it to put the ship at the defendant's dock, and this was agreed to.

The apples were delivered to the defendant's dock in O'Brien's truck on April 14, 15 and 16. Upon completion of the delivery J. W. Schreiner, the defendant's supervisor on the pier, in charge of receiving and assembling cargo, prepared and gave to O'Brien's truck driver a "Receiving Memorandum", identical with the one copied above, with the exception that in the space after the printed words "for account of" was written "Same". The following day, April 17, O'Brien's truck driver returned to the dock and asked that the name of the United States National Bank be substituted for "Same". Accordingly, Schreiner took up the first receipt and made out and delivered to O'Brien's truck driver the receipt, a copy of which has been set out, on which, as stated, the Bank predicates its right of recovery. O'Brien delivered this receipt with other documents to the Bank on April 17, and on that day the Bank made the first loan to him of $5,000.00. The Bank then knew that O'Brien intended to ship a part of the apples on April 30 and the balance on May 10, and that he had physical control of the apples.

Pursuant to the contract for cargo space which O'Brien had entered into with the General Steamship Corporation, the apples were loaded on board the motorship "Silverteak" on May 11, 1947, and the vessel sailed on that day or the day following for Manila. Before that O'Brien had the apples marked

and strapped for exporting. The defendant did not notify the Bank before releasing the apples to the vessel. Before the shipment the defendant had received from General Steamship Corporation a "cargo lineup" of the "Silverteak", showing, with other data, that Columbia Pacific Distributing Company had procured space on that vessel for 5000 boxes of apples. The freight charges were not prepaid, and for that reason the bills of lading were not received by the Bank.

After the vessel sailed and "quite some time" before it arrived in Manila there were negotiations between Mr. Frank C. Hak, vice president of the Bank, and Mr. H. C. Savage, assistant operating manager for the General Steamship Corporation, in which Mr. Hak asked if the Bank could pick up the bills of lading on payment of the freight charges, and was informed that it could do so. The bills of lading were made out to the order of O'Brien, and O'Brien informed Savage by letter that he released his interest in the apples in favor of the Bank, and Savage so advised Hak. At first the Bank indicated its intention to pick up the bills of lading, but later changed its mind and brought this suit.

The defendant introduced evidence of a custom or usage among dock operators and those who deal with them, including shippers, brokers and freight forwarders, affecting the use of receiving memoranda such as the one here in controversy. Witnesses to this custom were Mr. George D. LaRoche, general manager and counsel for the Commission of Public Docks in Portland; the district manager of Interstate Terminals of Portland; the district manager of Coastwise Lines and manager of Columbia Basin Terminals, Portland; the district manager of defendant; the assistant operating manager for General Steamship Corporation;

and the assistant manager of the Bank of California in Portland. Their evidence was to the following effect: All Portland docks use a form of receiving memorandum identical with, or similar to, the receiving memorandum here in question. Goods arrive at the dock either by rail car or in trucks. If the person delivering the goods has with him a shipping document, the representative of the terminal makes a notation thereon of their receipt; otherwise a receiving memorandum is given. The receiving memorandum, sometimes called a "dock receipt", is, as Mr. LaRoche testified, "only for information purposes", and it is not the custom or usage to notify the person to whom or for whose account the receipt is issued or to require surrender of the receipt before the merchandise is removed from the dock. The purpose of the receipt is only to evidence goods on the dock and not ownership or title. On request, formal warehouse receipts are issued. In that case the goods are not moved from the dock until either the receipt is surrendered or other sufficient collateral or security substituted.

None of this evidence is disputed.

In addition there were received in evidence forms of receipts variously designated, such as "checker's receiving memorandum" used by the Commissioner of Public Docks, and "dock receipt" used by Interstate Terminals. The defendant also offered in evidence forms of warehouse receipts used by it and others which follow substantially the requirements for such documents contained in § 60-202, O. C. L. A. (a part of the Uniform Warehouse Receipts Act), to which further reference will be made later in this opinion. On objection of the plaintiff, these documents were excluded by the court.

The plaintiff, to support the decree, makes two principal contentions: First, that the receiving memorandum constitutes, or is evidence of, a contract of bailment of the apples between the Bank and defendant, which contract was breached when the defendant, without notice to the Bank, released the apples; second, that the document is a warehouse receipt within the meaning of the Uniform Act, and that the defendant is liable as for a conversion for delivering the goods otherwise than as provided in such act (§§ 60-209, 60-210, O. C. L. A.); and also for permitting the goods to be shipped without "the written assent of the holder of the receipt" as provided in § 60-112, O. C. L. A., which is not a part of the Uniform Act.

■ We consider first the question whether the receiving memorandum is a warehouse receipt. It should be premised that, whatever its character, the paper is not negotiable. The words "Non Negotiable" are printed on it, and it in no way measures up to the definition of a negotiable receipt in § 60-205, O. C. L. A. This is not disputed by plaintiff. The defendant claims that it is not a warehouse receipt because it does not comply with certain requirements of § 60-202, O. C. L. A., which specifies what "every such receipt must embody within its written or printed terms". The particular requirements of that section which it is said are omitted are (d) "A statement whether the goods received will be delivered to the bearer, to a specified person, or to a specified person or his order"; (e) "The rate of storage charges"; and (g) "The signature of the warehouseman, which may be made by his authorized agent". The last point is based upon the proposition that Schreiner, who signed the memorandum, was not authorized to sign warehouse receipts. In the view we

take of the case, this question need not be decided. Plaintiff concedes, of course, that the requirement as to the rate of storage charges was not complied with. It asserts that the words "for account of U. S. National Bank" are a sufficient compliance with (d). It contends, and in this contention we agree, that a document may be a warehouse receipt even though all of the requirements of § 60-202, O. C. L. A., are not met. The reasons which have impelled the courts so to hold are well stated in *New Jersey Title Guarantee & Trust Co. v. Rector,* 76 N. J. Eq. 587, 75 Atl. 931, in which it was contended that a receipt failed to comply with the act because it did not contain a statement whether the goods will be delivered to the bailor or to a specified person or his order, or a statement as to the rate of storage charges. The language of the instrument was held to be sufficient to justify the inference that the goods would be delivered to the depositor. As to the other point of objection, the court held that the provision in § 60-202, to the effect that a warehouseman will be liable to any person injured thereby for all damage caused by the omission from a negotiable receipt of any of the terms required, would indicate that the law recognizes receipts from which some of the terms set out in the act are omitted, and reasoned that these terms are rather for the benefit of third persons or innocent holders than the original parties, and in either case omissions do not destroy the character of the writing as a warehouseman's receipt. Other cases taking the same view are *Woldson v. Davenport Mill & Elevator Co.,* 169 Wash. 298, 13 P. (2d) 478; *Manufacturers' Mercantile Co. v. Monarch Refrigerating Co.,* 266 Ill. 584, 107 N. E. 885; *Equitable Trust Co. v. White Lumber Co.,* 41 F. (2d) 60 (D. Idaho); *Laube*

*v. Seattle National Bank,* 130 Wash. 550, 228 P. 594; *Joseph v. Viane, Inc.,* 194 N. Y. S. 235, 118 Misc. Rep. 344; *Smith Brothers Co., Ltd. v. Richheimer & Co.,* 145 La. 1066, 83 So. 255. See, also, *Bank of California, N. A. v. Schmaltz,* 139 Or. 163, 167, 9 P. (2d) 112.

We have seen no case which holds that an instrument may be a warehouse receipt notwithstanding noncompliance with Subd. (d) of § 60-202, O. C. L. A., except the *nisi prius* decision in *Joseph v. Viane, Inc.,* supra. The writing there omitted five of the requirements of § 60-202. It did not even contain the word "receipt" or a derivative or synonym of that word. It was held, nevertheless, to be a warehouse receipt on the authority of some of the cases which we have cited. This decision is relied on by the plaintiff in its brief. It supports the view that compliance with all the requirements of § 60-202 is not essential; but it is opposed to plaintiff's contention that the words "for account of" are equivalent to a statement whether the goods will be delivered to the bearer, to a specified person, or to a specified person or his order. Those words were used in the receipt involved in the New York case, but the court held that they were not a compliance with Subd. (d).

They were used in the negotiable warehouse receipts involved in *Nordwall v. Cohen,* 134 Wash. 262, 235 P. 824, another case cited by the plaintiff. The receipts were executed to one Smith "for account of" various other named individuals, who were in fact the owners of the stored goods. The court held that "the receipts themselves contained notice that Smith's title was not absolute. On their face they showed an adverse interest." Parties claiming ownership of the goods as purchasers for value of the receipts were

held to be put on inquiry by the phrase in question. It was not held that these words amounted to a statement that the goods were to be delivered to the persons for whose account the receipts were issued.

In *Equitable Trust Co. v. Rochling,* 275 U. S. 248, 72 L. ed. 264, 48 S. Ct. 58, it was contended that the words "for account of" in two cashier's checks meant that the bank to whose order the checks were drawn was constituted an agent to collect them. In resolving this contention the court considered the course of dealing among the parties, saying:

> "Moreover, the words themselves, despite their wide commercial use and the importance of giving them, as far as practicable, a uniform effect, have no rigid and unchangeable significance. Their purpose is to express intention. They are not an incantation which unfailingly invokes an agency. And the circumstances in this case indicate that they were here used with a different object." (275 U. S. 253.)

In the circumstances of this case the words "for account of U. S. National Bank" cannot be given the significance which the plaintiff attaches to them. They are ambiguous words whose meaning must be ascertained in view of the setting in which they are used. An ordinary receipt, not signed by both parties, is not always a contract. *McCargar v. Federal Securities Co.,* 134 Or. 342, 356, 284 P. 179, 293 P. 595; *Pierce v. Northern Pacific Railway Co.,* 127 Or. 461, 466, 271 P. 976, 62 A. L. R. 644, and Oregon cases there cited; *Savage v. Salem Mills Co.,* 48 Or. 1, 85 P. 69, 10 Ann. Cas. 1065; *Hirsch v. Salem Mills Co.,* 40 Or. 601, 67 P. 949, 68 P. 733. See, also, *State v. Stockman,* 30 Or. 36, 46 P. 851. The receipts involved in the Savage and Hirsch cases were more definite and specific in

their provisions than the receiving memorandum in question here; but, since they did not embody the entire contract of the parties, parol evidence was held admissible to show what the actual agreement was. In the Savage case, which dealt with the question of the title to wheat delivered to defendant by various persons and destroyed by fire, the decision turned upon whether the transactions were bailments or sales. If the former, the loss fell upon the plaintiff and his assignors; if the latter, upon the defendant. Load checks and receipts were issued by the defendant for wheat delivered to it. Notwithstanding the receipts read "Received in store for account of * * *" and provided for the rate of storage, it was held that they did not embody the entire contract and that a transaction, which on the face of the writings seemed to indicate a bailment, was in fact a sale. The court said:

"* * * The entire contract between the defendant and the persons delivering wheat to it was not embodied in the written memoranda, and it is not from a consideration of the writings alone that we are to determine the character of the transaction or the respective rights and obligations of the parties. The entire contract must be ascertained from the custom and usage of the business and the general understanding of the parties in connection with such load checks and receipts. The words 'in store,' used in the receipt are not controlling as to the nature of the transaction, as appears from the authorities referred to hereafter." (48 Or. 12.)

The Hirsch case is a similar decision. It involved a receipt identical in form to that construed in the Savage case. The court thus announced the controlling principle:

"A receipt issued by a warehouseman and accepted by the owner of the commodity stored, as

expressing the terms and conditions upon which it was delivered and received, is a contract, and, like all other written contracts, cannot be contradicted or varied by parol * * *; but when the receipt is silent as to the terms of the contract, it may be shown by parol * * *; and when its language is ambiguous and uncertain, it must, like any other contract, be interpreted in the light of the surrounding circumstances * * *." (40 Or. 604.)

■ Here the contract was between O'Brien, the owner of the apples, and the defendant. The defendant's engagement was to receive the apples, place them in its refrigerating plant, keep them there until the vessel "Silverteak" put in at the dock, and then deliver them to the vessel. As a part of the transaction the receiving memorandum was given to O'Brien, according to the uncontradicted evidence of usage, simply to show that the apples had been received on the dock. Also, according to the evidence of usage, the contract did not contemplate that the receiving memorandum should be surrendered to the defendant before it was authorized to release the apples. That evidence of usage was competent and that the custom entered into, and became a part of, the contract is, we think, not open to doubt. *Hurst v. W. J. Lake & Co., Inc.*, 146 Or. 500, 31 P. (2d) 168; *Savage v. Salem Mills Co.*, supra; *Hirsch v. Salem Mills Co.*, supra. The custom does not, as plaintiff contends, contradict the writing, which indeed was not the contract, and the case of *Interior Warehouse Co. v. Dunn*, 80 Or. 528, 157 P. 806, on which plaintiff relies, is, therefore, not apposite.

■ We hold that the receiving memorandum was not a warehouse receipt, not merely because it does not comply with all the requirements of the statute as to what such a receipt should contain, but because it was not

intended by the parties to the contract to be a warehouse receipt. Under § 60-208 a warehouseman is bound, in the absence of lawful excuse, to deliver the goods upon demand made by "the holder of a receipt for the goods". The evidence in this case manifests that the parties to the contract did not intend the receiving memorandum to serve any such purpose. That writing was merely incidental to the entire contract.

We come now to plaintiff's contention that, whether the receiving memorandum is a warehouse receipt or not, defendant still is liable to the plaintiff for a breach of its common law duty as bailee. "The sole issue in this case", it is said in plaintiff's brief, "is the question of *who had the right to control the delivery of the apples from* Appellant's custody." The plaintiff argues that the receiving memorandum, by reason of the phrase "for account of U. S. National Bank", constitutes a contract directly between the Bank and defendant, and that this contract was breached when the defendant released the apples without first getting the consent of the Bank.

■ Much of what has already been said is applicable to this contention. Not only is the receiving memorandum, as we have held, not the entire contract, but there was no contract between the Bank and the defendant. O'Brien was not the Bank's agent. His relationship to it was that of a debtor. There is no evidence that he was authorized to enter into a contract of bailment for the Bank, and we find no claim in plaintiff's brief that he had such authority. In depositing the apples with the defendant he was acting for himself as the owner of the goods. The words, "for account of U. S. National Bank", were obviously inserted in the memorandum to indicate that the Bank had an

interest in the apples. They were not intended to serve any other purpose.

Plaintiff argues that, in any event, the receiving memorandum was notice to the defendant of the Bank's adverse interest and put the defendant upon inquiry, and that the defendant must be held to have discovered any fact that inquiry would have discovered, citing *Bohlman v. Coffin*, 4 Or. 313; *Hopkins v. McCarthy*, 121 Me. 27, 115 Atl. 513; *Nordwall v. Cohen*, supra. The case last cited is particularly relied on. It has to do with a number of negotiable warehouse receipts, each of them issued to one person "for the account of" another, and their transfer by the former to parties who asserted title to the stored property as purchasers of the receipts for value. The persons for whose account the receipts were issued were in fact the owners of the property, and the court decided against the holders of the receipts on two grounds: First, that through their agent they had knowledge of the true ownership; and, second, that the language of the receipts which we have quoted was such as to put them on inquiry, and that they were charged with knowledge of any fact which inquiry would have discovered.

■■ The rule of inquiry does not govern this case. So far as that rule is concerned, one claiming to be a bona fide purchaser for value of negotiable paper is in quite a different position from a bailee. At common law a bailee is estopped to deny the title of his bailor at the time of the delivery of the property, and, when he receives the property by virtue of the bailment, he legally admits the right of the bailor to make the contract of bailment. *Colbath v. Hoefer*, 43 Or. 366, 73 P. 10; 6 Am. Jur., Bailments, 245, § 97; 8 C. J. S., Bailments, 253, § 21; Schouler on Bailments (3d ed.) 73,

§ 60. Section 16 of the Uniform Warehouse Receipts Act is an affirmation of the common law principal. 56 Am. Jur., Warehouses, 334, § 27. The rule, however, is today subject to a number of well-defined exceptions (6 Am. Jur., Bailments, 246, § 98), one of which, with its limitations, is stated in the same text at p. 257, § 119, as follows:

"A bailee who has received sufficient notice of the claim of the true owner to the bailed property may not deliver it to the bailor or to another person, or permit it to be taken out of his possession by another, whereby it is lost to such owner, without rendering himself liable to the owner as for a conversion. This rule is usually applied to cases where the true owner has made demand for the property or has asserted his title and instructed the bailee to retain the property for him. In cases where no demand has been made, the authorities support a doctrine somewhat more favorable to the bailee and more consistent with the rule that the bailee's estoppel to deny his bailor's title is relaxed to permit him to set up that of the true owner only where he has yielded to such owner's demand. According to this doctrine the bailee may safely return the property to the bailor, or deliver it to another, in accordance with the terms of the bailment, after having notice of the claims of the owner, provided he does so before any demand is made for the possession of the property and if he does not assert any right of dominion or control over it adverse to the title or inconsistent with the rights of the owner, at least where the character and status of the property remain the same as before the bailment, so that the owner's rights are not prejudiced by the return."

Again, it is said in American Jurisprudence:

"Certainly no bailee, whether he remains in possession or not, will be permitted to assert against

his bailor the adverse title of a third person, merely upon his own motion and in absence of a yielding by him to the rightful demand of a paramount claimant." 6 Am. Jur., Bailments, 247, 248, § 101.

See, to the same effect, Schouler, op. cit., 127, § 118.

The application of these rules is illustrated in the two cases of *Paccos v. Rosenthal,* 137 Wash. 423, 242 P. 651, 43 A. L. R. 142, and *Hattiesburg Auto Sales Co. v. Morrison,* 136 Miss. 632, 101 So. 690, 43 A. L. R. 147. See annotation to these cases, 43 A. L. R. 149. In the former case it was held that a bailee, who returned the bailed property to his bailor, with notice of the adverse interest of a third party who, however, had made no demand upon him, would not be liable in conversion to the third party.

The court quoted with approval from *Nelson v. Iverson,* 17 Ala. 216, the following statement of the rule:

"If the bailee have the temporary possession of property, holding the same as the property of the bailor and asserting no title in himself, and in good faith in fulfillment of the terms of the bailment, either as expressed by the parties or implied by law, restores the property to the bailor before he is notified that the true owner will look to him for it, no action will lie against him, for he has only done what was his duty."

On the other hand, in the Hattiesburg Auto Sales Co. case a bailee of a stolen car was held liable for its value to the true owner for redelivering the car to the bailor after demand by the true owner.

See, also, *Ex parte Davies,* (1881) L. R. 19, Ch. Div. (Eng.) 86 (C. A.); *Davison v. Alaska Banking Co.,* 5 Alaska 683; *Sinclair v. Murphy,* 14 Mich. 392.

■ The Bank was not the owner of the apples, but at most a mere lienee. Whether its lien gave it the right, as between itself and O'Brien, to control the delivery of the apples, is a question that we need not decide. Whatever its rights in that regard may have been, it did not assert them. Since it gave no notice to, and made no demand upon, the defendant, although it knew the apples were in its possession as bailee and knew the purpose of the bailment, the defendant was justified under the law as expounded in the foregoing authorities, in delivering the apples to the vessel in the due discharge of its duty to O'Brien. The defendant was not required upon its own motion to assert the rights of the Bank against the defendant's bailor.

There is a further claim on the part of the plaintiff that it is entitled to recover as the beneficiary of a third-party-beneficiary contract. In view of our interpretation of the evidence, this contention does not call for discussion.

It would appear that this controversy did not arise out of the defendant's act in delivering the apples to the vessel without first getting the permission of the Bank, but out of the failure of the steamship company to notify the Bank that the apples were on board its vessel. It is the testimony of Mr. Hak, who handled the business for the Bank, that in previous similar transactions the steamship company would so notify it, and that the Bank would then make a further advance to O'Brien to pay the shipping charges and the steamship company would deliver to the Bank the bills of lading without which O'Brien's sight drafts on Manila would not be honored. Mr. Hak also testified that, in handling this type of shipment, as soon as space was available the Bank would check with the steamship

company and "We would either release to them or release to O'Brien on trust receipt, the document which we held covering the merchandise." (This evidently refers to the receiving memorandum or other similar document. There is evidence that in one transaction involving a shipment of sardines a receipt in the form of a stamp placed by the defendant on a shipping document used by O'Brien was taken by the Bank and afterwards delivered to the steamship company. There is no evidence that receipts of the kind involved in this case were ever delivered to the warehouseman before the goods were released.) In this instance, Mr. Hak could not recall that O'Brien ever told him that he had secured space on the "Silverteak", but one of the letters of credit which the Bank received showed that a part of the shipment of apples was to go out on the "Silverteak", and there is convincing evidence that the Bank knew before the vessel sailed that the apples were on board. There is nothing to show (and it is no doubt not important) why O'Brien failed to get the additional advance from the Bank to pay the shipping charges. In view, however, of the facts which have just been stated, there is every reason to believe that, even though the defendant had notified the Bank that it was about to deliver the apples to the vessel, the course of events would not have been altered.

It is our conclusion that, under the evidence and the applicable rules of law, the plaintiff is not entitled to recover, and that it would be unjust and inequitable under all the circumstances of this case to require the defendant to pay O'Brien's debt to the Bank.

The decree is therefore reversed and the suit dismissed.