THEODORE WEILAND, Assignee, v. GUS. F. SUNWALL and Others.[1]

December 24, 1895.

Nos. 9740–9741–9742–9743—(226–227–228–229).

**Grain—Bailment or Sale.**

Evidence considered, and *held* to justify the findings of fact that certain transactions constituted sales, and not bailments, and that another transaction constituted a bailment, and not a sale; also, that the facts found justified the conclusions of law except in one particular, as to which the conclusion of law and order for judgment is modified.

Action in the district court for Scott county by Theodore Weiland, as assignee of Frank Nicolin, insolvent, to determine the rights of all parties to wheat received in his elevator at Jordan by the insolvent before the assignment. Defendant Klinkhammer and certain other defendants and also defendants Sunwall and New Richland Milling Company had previously instituted replevin actions for the wheat. All the actions having been tried together, the court, Cadwell, J., found against all the defendants except New Richland Milling Company, but found in its favor. From orders denying their motions for a new trial, defendants Klinkhammer and others, defendant Sunwall, and the other defendants, except New Richland Milling Company, respectively appealed. From an order denying his motion for a new trial as against New Richland Milling Company plaintiff appealed. Modified.

*James McHale* and *Davis, Kellogg & Severance*, for plaintiff, appellant.

*Southworth & Coller*, for Klinkhammer and others, appellants.

[1] Reported in 65 N. W. 628.

*Spooner & Flaherty*, for appellant Sunwall.

*Frank Warner* and *C. E. Vanderburgh*, for other defendants, appellants.

*W. C. Odell*, for New Richland Milling Company, respondent.

MITCHELL, J. In March, 1893, Nicolin, an insolvent debtor, executed to one Hilgus an assignment, under the insolvency law of 1881, of all his property, for the benefit of his creditors. Subsequently, the plaintiff was appointed receiver in his place. Nicolin owned and operated a grain elevator at Jordan, in which there were at the date of the assignment over 16,000 bushels of wheat. Shortly after the assignment, several parties brought actions against the assignee to recover various amounts of this wheat, claiming that it was their wheat, which they had stored with Nicolin as warehouseman. There were numerous other persons who made like claims, but who did not bring actions.

In this condition of affairs, the assignee brought this action in equity, joining as defendants all the claimants of the grain, both those who had brought suits and those who had not. The assignee asked that it be adjudged that all the grain was the property of Nicolin, and, as such, passed to him under the assignment; but, if the court should determine otherwise, that it adjust and determine the rights of all the defendants, and that the grain be decreed to be distributed among the several parties entitled thereto, in such proportions as the court should determine to be just and proper. By stipulation of all parties, the replevin suits were consolidated with the equity suit, and all tried together; it being agreed that the determination of the equity suit should be a final determination of the replevin suits.

As the defendants' claims amounted in the aggregate to about 60,000 bushels, and as there were only between 16,000 and 17,000 bushels in the elevator, it is manifest that, if all the claims were valid, there would not be grain enough to satisfy them in full. The assignee contends that, under such circumstances, no claimant could maintain replevin; that his only remedy would be by suit in equity, to which all the claimants were parties; while, on the other hand, those claimants who brought replevin contend that they thereby acquired a priority over the others. The first question becomes im-

material in view of the fact that the assignee has himself brought this suit, to which all the claimants are parties, and before the court. The contention of the replevin claimants is wholly untenable. The grain was all commingled in one common mass, and, if it was a bailment, then the bailors were owners, as tenants in common; and clearly one of them cannot, as against the others, either by replevin or otherwise, recover more than his pro rata share. If part of the bailed property had been converted or lost, the loss must be borne by all in proportion to their respective interests in the commingled mass.

The trial court found against all the defendants except the New Richland Milling Company, but found in its favor; and the principal question is whether the findings are justified by the evidence. The evidence is different as to different defendants, and presents three different states of facts, viz.: (1) As to the New Richland Milling Company; (2) as to Sunwall; and (3) as to all the other defendants, whom, for brevity, we will call "ticket holders," as to all of whom the evidence is the same. We will consider these in inverse order.

1. It appears from the evidence that Nicolin owned and operated a flouring mill in Jordan. Within 60 to 80 feet from the mill he had an elevator, which is the one in which the wheat in controversy was situated. This elevator was used by Nicolin for the receipt and storage of grain designed to be ground in the mill. It was really an adjunct to the mill, being connected with it by conveyors to conduct the wheat from the elevator to the mill. The elevator was used exclusively for the purposes of the mill; all wheat received into it being ground as needed, and none ever being sold or removed for any other purpose. It was in charge of an agent of Nicolin; and the uniform manner of doing business was, when a farmer or other party brought a load of wheat to the elevator, this agent received it, ascertained its weight and grade, and gave the party delivering the grain a receipt in the following form, after filling up the blanks for date, name, amount, and grade: "Jordan City Mills. Ticket No. ——. Jordan, Minn. ——. Received of —— —— bushels No. —— Wheat. [Signed] Frank Nicolin, Proprietor, per ———." On the margin of these tickets were printed the words "Not transferable."

When wheat was thus delivered, there was no verbal agreement made; the acts of the parties above stated constituting, so far as

appears, all that was done. The parties receiving these tickets presented them, when they saw fit, to Nicolin, at his office, in another part of the village, and received pay for their wheat at the market price on the day when the tickets were presented. Sometimes tickets were not presented for more than a year after they were issued. Business had been conducted in the same manner for many years. During all that time no one had ever called for a return of the wheat represented by any of these receipts. No storage was ever charged by Nicolin on any grain thus delivered into the elevator, however long a time might elapse after its delivery before the presentation of the tickets for payment. Nicolin used the wheat as his own from the time of its receipt, and ground it up in his mill as he needed it, without any reference to the amount of outstanding tickets. The above mode of conducting the business was generally understood throughout the whole community .tributary to Jordan. The defendant ticket holders themselves had been in the habit of dealing with Nicolin for years in this same way, bringing in their wheat, and getting their tickets cashed when they got ready. The ticket holders who testified also admitted that they knew that Nicolin was accustomed to grind up all the wheat in his mill, and that that was what he took it in for.

There was no evidence, direct or indirect, to contradict or in any way materially impair the force of the testimony above recited. In our judgment, it was sufficient to justify the trial court in finding that the transactions between Nicolin and the defendant ticket holders constituted sales, and not bailments,—that is, present sales at the time of the delivery of the grain; the price, however, to be the market price on the day when the tickets were presented for payment.

2. Sunwall was operating an elevator at New Prague, at which he carried on the business of buying wheat, and receiving wheat in store for others. He was buying wheat on commission for Nicolin, which he shipped from time to time to Jordan, where Nicolin's mill was situated. The terms of the contract between Sunwall and Nicolin were that the former was to buy, store, and ship wheat for the latter at New Prague; Nicolin agreeing to accept all the wheat which Sunwall might buy, receive, or store in his elevator at the prices paid therefor, and allow him 3½ cents per bushel for his services, and

furnish funds in advance for buying the wheat, by paying drafts drawn on him by Sunwall for that purpose.    This business had been going on since August, 1891, Sunwall drawing drafts on Nicolin, and shipping wheat to him from time to time.    It fairly appears from the evidence that the exact terms of this contract were not strictly observed; that Sunwall sometimes overshipped,—that is, shipped wheat to Nicolin faster than he received money to pay for it, so that sometimes Nicolin owed Sunwall money, while at other times Sunwall owed Nicolin wheat.

Sunwall claims that about the last of January, 1893, there was, as he expresses it, a "cut off" in the business of buying wheat on commission; that he then made a verbal agreement with Nicolin by which he was to ship some of his "stored" wheat to Jordan, where Nicolin was to store it for him in his elevator at that place.    The reason, as he testifies, for making this arrangement, was that his elevator was full, and that he had been compelled to ship wheat for storage to Minneapolis, where he had to pay storage charges, while Nicolin agreed to store it for him free of charge.    He claims that, under this agreement, he shipped, during February, a quantity of wheat to Jordan, for storage in Nicolin's elevator, and that this was a part of the wheat in that elevator at the time of Nicolin's failure. The evidence is so voluminous, and its force so largely dependent on circumstances and figures, that it is impossible to give anything like a full and correct idea of its probative effect within reasonable limits.

We can only refer to a few prominent facts.    Sunwall did not pro- duce his books or any written evidence to support his oral testimony as to the alleged contract for storage.    It appears that, after he claims to have made this contract, the business was conducted ex- actly as before, he from time to time shipping wheat to Nicolin, and receiving money from Nicolin with which to pay for wheat, the last shipment of wheat being made on February 27, and the last money received from Nicolin on March 8; that the amount of wheat thus shipped during February amounted to between 9,000 and 10,000 bushels; that during this time the amount of overshipments—that is, shipments of wheat more than he had received money to pay for— varied greatly from time to time, being sometimes more and some- times less, until on and after the last payment of money by Nicolin,

on March 8, it stood at 4,722.35 bushels, which is the amount of wheat which Sunwall now claims he shipped for storage. In making shipments during February, Sunwall made no distinction between stored wheat and wheat bought, and gave no directions to Nicolin in regard to it, but made all his shipments exactly as he had been in the habit of doing. Sunwall's testimony as to the alleged contract for storage was unsatisfactory and self-contradictory, and was flatly contradicted by the testimony of Nicolin.

Our conclusion is that the evidence justified the finding of the court that no wheat was shipped under any contract for its storage, but that it was all shipped as wheat bought by Sunwall for Nicolin, under his contract of agency.

It is contended, however, that, even if this was so, yet if, as claimed, it was wheat which had been left with Sunwall for storage, it belonged to the depositors, who could have reclaimed it; and that as Sunwall has since redeemed his tickets, and paid his depositors for the wheat, he, as their assignee, is entitled to the wheat. But he does not stand in the shoes of his depositors. If he delivered the wheat to Nicolin as wheat bought for him, he cannot reclaim it on the ground that he had no right to do so, because it belonged to third parties, whose title he afterwards acquired. The case would not differ in principle from any case where a party sells personal property that does not belong to him, but subsequently buys in the title of the true owner.

3. The facts relating to the claim of the New Richland Milling Company may be summarized as follows: That company and Nicolin, as copartners, under the name of the New Prague Elevator Company, were operating a grain elevator at New Prague. Their primary and perhaps principal business was buying wheat for the use of their respective mills, each partner paying half the cost, and then dividing the wheat between them. But there was ample evidence to justify the finding that, in addition to this business of buying wheat for their own use, they were also engaged in the business of warehousemen, in receiving wheat in store for others. The tickets issued under such circumstances appear to have been in the following form: "Ticket No. ———. Bought ———, account of ——— or bearer, ——— bushels. No. ——— wheat. [Signed] ———————, New Prague Elevator Company." But stamped on the ticket were the words

"Stored. Not transferable." The fact that these tickets commenced with the printed word "Bought" is by no means conclusive that the transaction was a sale, and not a bailment, especially in view of the fact that the word "Stored" was stamped on the ticket at the time it was issued. The evidence was sufficient to justify a finding that these transactions were, as between the depositors and the elevator company, bailments, and not sales; so that the wheat remained the property of the former.

It also appeared that in the early part of the winter of 1892-93, the elevator being full, the two partners, the New Richland Milling Company and Nicolin, agreed that this stored wheat, or at least a considerable part of it, should be shipped out, and placed in store, half of it in Nicolin's elevator, at Jordan, and half in the milling company's warehouse, at New Richland; that in pursuance of this arrangement, during the months of December, 1892, and January and February, 1893, 5,295 bushels of this stored wheat were shipped out, and placed for storage in Nicolin's elevator, at Jordan, although commingled with Nicolin's own wheat of like grade, and constituted a part of the wheat in the elevator at the time of the assignment.

Notwithstanding that, in thus dividing the stored wheat between their warehouses adjacent to their respective mills, the partners may have anticipated that they would ultimately buy it from the depositors, yet, in our opinion, the evidence justified the conclusion that it was so removed and deposited merely for the purpose of storage, and that it still continued, and was intended to continue, the property of the depositors. After Nicolin failed, the New Richland Milling Company bought the wheat of the depositors, paid them for it, and took up the storage tickets. Under that state of facts, the New Richland Milling Company became the owners of the wheat, and stood in the shoes of the depositors, and acquired the same rights to recover the wheat as the depositors had possessed. Our conclusion is that the evidence justified the findings of the trial court as to these facts.

We have not overlooked the fact that the manager of the New Richland Milling Company stated in one place, on cross-examination, that Nicolin owned half of the wheat, and his company the other half; but in view of the other evidence in the case, and especially the qualifica-

tions which the witness afterwards made, this statement of opinion is not at all controlling.

As the New Richland Milling Company was the last one to bring replevin, there was not wheat enough in the elevator to satisfy its demand, and it only obtained, on the writ of replevin, 2,860 bushels, leaving a deficiency of 2,435 bushels, of the value of $1,241.85. The cause of the deficiency, of course, was that the defendant ticket holders had replevied the balance of the wheat. As conclusions of law, the court below held that the milling company was entitled to judgment against the assignee—First, that it have possession of the 2,860 bushels taken on its writ; and, second, for the value of the 2,435 bushels, the amount of the deficiency. This second conclusion must be modified, for, as it stands, the milling company would be entitled to an unconditional judgment against the assignee, without reference to whether he ever collected his judgments against the replevin defendants. These other defendants have obtained possession of part of the milling company's wheat; and if the assignee recover this, or its value, the milling company would be entitled to have the court direct him to pay over to it its proportionate share. But, if the assignee should be unable to enforce his judgments against the replevin defendants, then, as to this deficiency, the milling company would occupy the position of a creditor of Nicolin, and its claim would be payable, as any other claim, out of the general assets of the insolvent in the hands of the assignee. The proper place to adjust these matters is in the insolvency proceedings.

Therefore, while the findings of fact stand, the conclusions of law and the order for judgment in favor of the New Richland Milling Company must be modified as above indicated. In all other respects the orders appealed from in all the appeals are affirmed.