IN THE

# SUPREME COURT

OF

# · OREGON

Argued 18 January, decided 27 February. 1906.

## SAVAGE v. SALEM MILLS CO.

85 Pac. 69.

ACTION FOR LOSS OF WHEAT IN WAREHOUSE—MISJOINDER OF CAUSES.

1. A complaint in which it is alleged that defendant operated a flouring mill having connected therewith a storage house for wheat; that it was the custom of defendant to receive wheat from farmers, to issue receipts therefor, to mix wheat received, and to sell the same or to grind it into flour at its own pleasure; that in delivering wheat and in issuing the receipt the parties contracted with reference to such custom; that plaintiff accordingly delivered to defendant a certain amount of wheat; that defendant sold and disposed of the same and applied the proceeds to its own use; that plaintiff demanded the wheat or the payment of the value thereof, and that defendant refused to give either—contains but a single cause of action for breach of contract, and is not subject to the objection that a cause of action for breach of contract has been joined with a cause of action for conversion.

PAROL EVIDENCE—WRITTEN INSTRUMENT—SILENCE OR AMBIGUITY.

2. Where a receipt is issued by a warehouseman and accepted by the owner of goods stored as containing the terms and conditions upon which the commodity is delivered and received, it becomes a contract between the parties, and cannot be contradicted or varied by parol testimony; but where it is silent as to the terms of the contract, or when its language is ambiguous or uncertain, its terms or its meaning may be shown by parol· and it may be interpreted in the light of surrounding circumstances.

CUSTOM AND USAGE AS PART OF CONTRACTS.

3. In the absence of an agreement to the contrary, the usage or custom of a particular business enters into and forms a part of a contract made by a person engaged in that business, and other persons dealing with him with knowledge of that custom, but proof of custom or usage is never admissible to give an interpretation to a contract inconsistent with its language.

(48th Or.—1)

WAREHOUSEMEN—CONCLUSIVENESS OF LOAD CHECKS.

4. A written receipt, commonly called a "load check," given by a proprietor of a wheat storehouse to persons leaving wheat in store, not showing who the wheat was received from, or its grade, or the terms or time of the deposit, and having some terms of doubtful meaning, manifestly is not conclusive as to the agreement concerning the storing of such wheat, so as to require the rejection of parol evidence on that subject.

APPEAL—TRIAL BY COURT—CONCLUSIVENESS OF FINDINGS.

5. Findings of a judge made after a trial without a jury have the force and effect of a verdict, and cannot be disturbed if they are supported by any competent evidence.

DEPOSITS OF WHEAT IN WAREHOUSE—SALES OR BAILMENTS.

6. Where one delivers grain to a keeper of a warehouse and mill under an agreement that either the identical grain or the same amount of a similar kind and quality shall be returned out of the common mass of which it became a part, there is a bailment of such property, and consequently the ownership and risk of loss remain in the depositor. Where, however, property of a commingleable kind is left with a keeper of a warehouse under an agreement that the latter may use it and discharge his obligation to the depositor by paying cash or returning the same amount of the same grade of such property from some other source, such leaving is a sale, and the warehouse keeper is liable for the price of such property, even though the receipt provided for the payment of charges for storage and for the value of sacks used, and excused the warehouseman from liability for damages caused by the elements.

INTEREST AFTER DEMAND.

7. Under a contract for the sale of property to be paid for on demand, interest begins to run from the time such demand is made, under Section 4595, B. & C. Comp., providing for interest on money after it becomes due.

From Marion: GEORGE H. BURNETT, Judge.

Statement by MR. CHIEF JUSTICE BEAN.

This is an action by George O. Savage against Salem Mills Co. to recover for wheat delivered to the defendant company by plaintiff and his assignors. The complaint contains 11 causes of action, but as they are all substantially the same, it will be necessary to refer to the pleadings only as they affect the first. It is alleged that the defendant is a corporation doing a general milling business; that at all the times mentioned in the complaint, and for many years prior thereto, it had owned and operated a flouring mill, having in conjunction therewith and connected thereto by stationary mechanical wheat conveyors a storage house, to hold and retain wheat received by it until such wheat should be sold or manufactured into flour or other mill products; that it was the custom and usage of the defendant to receive wheat from the farmers, giving load checks therefor,

showing the name of the person from whom received, the date
and number of bushels, and thereafter, at the convenience of
the parties, to issue a receipt to the holders of such load checks,
a copy of which receipt is set out; that it was the custom and
usage of the defendant, known and agreed to by parties deliver-
ing wheat to it, to mix the wheat received with its consumable
stock, and to sell the same or grind it into flour and sell the
flour at its pleasure and to retain the proceeds thereof; that
the party delivering wheat, by paying $2\frac{1}{2}$ cents per bushel for
storage and $3\frac{1}{2}$ cents per bushel for sacks could demand pay-
ment for the wheat so delivered in merchantable wheat at any
time before the 1st day of July next following the delivery,
subject, however, to the defendant's preferred right to purchase,
but in case such demand should not be made prior to the date
stated, it should be optional with the defendant, either to pay
the market price of wheat of the kind and quality delivered at
the date of the demand, or deliver an equal quantity of mer-
chantable wheat upon the payment of storage and for sacks;
that such custom and usage were known and agreed to by all
parties doing business with the defendant, and in delivering
wheat and in issuing the receipt mentioned, the parties con-
tracted with reference to such usage and custom, and such
receipt was based upon and controlled thereby; that on the ——
day of August, 1899, the plaintiff delivered to the defendant at
its mill 2,092 bushels and 12 pounds of merchantable wheat and
received from it the customary load checks therefor; that such
wheat was delivered to and accepted by the defendant under
and in accordance with such usage and custom and not other-
wise, and the same constituted and was the contract in reference
thereto; that no part of the wheat so delivered was ever returned
to the plaintiff or paid for in money or in kind, except 55 bush-
els and 12 pounds, paid in mill feed and flour, leaving a balance
of 2,037 bushels due the plaintiff; that soon after receiving the
wheat defendant sold and disposed of the same and applied the
proceeds to its own use; that on August 17, 1901, the plaintiff
tendered to defendant the requisite amount for storage and for
sacks and demanded the delivery to him of 2,037 bushels of

merchantable wheat or the payment of 50 cents a bushel, the value thereof, but defendant refused to do either. The plaintiff therefore demanded judgment against it for the value of the wheat with interest thereon from the date of the demand.

A demurrer to the complaint on the ground of a misjoinder of causes of action (one in contract and the other in tort) being overruled, the defendant answered, admitting the receipt by it from the plaintiff of 2,092 bushels and 12 pounds of wheat in August, 1899, and that it issued and delivered to its customers load checks and final receipts as set out in the complaint, but denying the other material allegations. For an affirmative defense it averred that for 25 years it had been engaged in the business of receiving grain for hire in store, charging and collecting storage thereon, and issuing checks and receipts therefor as provided by statute; that in such business it had acquired and operated warehouses and equipped them in the manner usual for storing and handling grain; that on September 21, 1899, the plaintiff had in store with it 2,037 bushels of wheat which had been previously deposited by him and received by it upon the terms and conditions and in accordance with the receipts set out in the complaint; that of the wheat so stored by plaintiff, 1,391 bushels and 50 pounds was white wheat No. 1, and 645 bushels and 10 pounds was white wheat No. 2; that on September 22, 1899, the grain then in store with the defendant, including that belonging to the plaintiff, was either consumed or damaged by fire; that at the time of such fire there was deposited with the defendant by 254 storers 122,534 bushels and 54 pounds of wheat of five different grades and values; that of such wheat 17,162 bushels and 22 pounds was not destroyed; the plaintiff's portion thereof being 23 bushels and 16 pounds, which the defendant has on hand. The reply put in issue the material allegations of the answer.

The cause was, by agreement of the parties, tried by the court without the intervention of a jury, and the findings and conclusions of law, omitting those giving the dates and amounts of wheat deposited by plaintiff's assignors, are as follows:

FINDINGS OF FACT.

"(1) At all the dates and times mentioned in the pleadings in this action, the defendant was and now is duly incorporated by and organized under the laws of the State of Oregon, and authorized by its charter to conduct a general milling and manufacturing business, and at all said times and dates was engaged in the business of buying and selling wheat and grinding wheat into flour and other mill products, and doing a general milling business at Salem, Or., at which place was and is situated its principal office and place of business.

(2) At all the dates and times mentioned in the pleadings in this action the defendant, for the purpose of carrying on its business, owned and operated a flouring mill at Salem, Or., by means of which it ground wheat into flour and other mill products, and also for the purposes of its business owned and operated in connection with its said flouring mill two other buildings at Salem, Or., in which were various bins, suitable for and used by the defendant for the purpose of holding and containing wheat. One of said buildings was joined and connected immediately to the said flouring mill, under the same roof, but with a covered passageway between them, into which wagons could be driven for the purpose of unloading wheat into said mill and said building so immediately connected with said flouring mill. The other of said buildings was distant from said flouring mill about 100 feet, but both of said buildings were so connected with said flouring mill by proper appliances, such as conveyors and the like, that wheat could be and was readily conveyed from the bins in said buildings to and into the grinding machinery in said flouring mill, and said flouring mill and two buildings were operated by defendant at all times as one plant or manufacturing establishment.

(3) At all the dates and times mentioned in the pleadings in this action it was the usage, custom and usual course of business between the defendant and all persons delivering wheat to the defendant in said flouring mill and buildings of defendant at Salem, Or., well known to and habitually acted upon by both the defendant and all such persons, for the defendant to issue and deliver to each person delivering wheat to the defendant at Salem, Or., for each wagon load of wheat so delivered a load check having the blanks therein filled according to the number of load check, the date of delivery, the amount in bushels and pounds of wheat delivered, and by and for whom delivered, in blank form as follows:

No...............
               S. F. M. Co., Salem, ................189...
Received from................................. ......bushels
Sacks returned ....................................
Sacks returned empty ...............................
               ...............................Weigher.
     Not transferable.

Which load checks were always signed by some duly author-
ized agent or employee of defendant, for and on its behalf, and
if so desired by such person for the defendant afterward to issue
to such person, in lieu of such load checks, a receipt having the
blanks filled therein, according to the date and number of issue,
for whose account and order, the number of cents per bushel
for sacks, and the amount of wheat delivered, in bushels and
pounds, in blank form as follows:

No..............

## SALEM FLOURING MILLS CO.
               Salem, Oregon, ....................189...
     Received in store for account of...........................
bushels of merchantable wheat, in bulk, subject to.............
order (damage by the elements excepted), on or before the first
day of July next, on payment of two and one-half cents per
bushel storage and.......cents per bushel for sacks, and the
return of this receipt, properly indorsed. The wheat being deliv-
erable on boat or cars, sacked. It is understood and agreed that
the Salem Flouring Mills Co. are to have the first refusal of said
wheat.
Bushels.................     ·
                              Salem Flouring Mills Co.,
                              Per...................

     Such receipts being always signed by the defendant by one of
its duly authorized agents.

     (4) At all the dates and times mentioned in the pleadings
in this action, it was also the usage, custom and usual course
of business between the defendant and all persons delivering
wheat to the defendant in said flouring mills and buildings of
defendant at Salem, Or., well known to and habitually acted
upon by both the defendant and all such persons, for the defend-
ant to mix all the wheat so delivered to the defendant with wheat
of the defendant in one common mass in the bins in said flouring
mills and buildings of the defendant at Salem, Or., the first
refusal of such wheat so delivered to defendant being reserved
by and conceded to defendant by such persons, and thereafter
for the defendant, at its own convenience and pleasure, without

any written authority from such persons, to ship out any of such common mass of wheat in said flouring mill and buildings, or to grind the same, or any part thereof, in its said flouring mill into flour and other mill products, and the same to sell for the account and benefit of the defendant; but at all such times the defendant had merchantable wheat of its own, either in said flouring mill and buildings of defendant at Salem, Or., or at other places in the State of Oregon outside of said Salem, equal in quantity and quality to the wheat of such persons so mixed as aforesaid in such common mass, and ground up or shipped out by the defendant.

(5) Generally in settlement of the claims arising out of the delivery of wheat to the defendant under the customs, usages and the general course of business set forth in the third and fourth findings of fact, the defendant's course of business was to pay by bank check or in money to the person delivering wheat the market value at Salem, Or., on the date of settlement, of merchantable wheat of the quantity delivered, but in some instances, instead of payment by bank check or money, the defendant would, in settlement of such claims, deliver to the owner of such claims merchantable wheat equal in quantity to the wheat theretofore delivered to the defendant, on payment by such owner of $2\frac{1}{2}$ cents per bushel for storage and $3\frac{1}{2}$ cents per bushel for sacks.

(6) During the crop season of the year 1899, and prior to September 22, 1899, the plaintiff, Geo. O. Savage, delivered to the defendant in its flouring mill and buildings aforesaid, at Salem, Or., 2,037 bushels of merchantable wheat, for all of which the defendant then and there delivered to him load checks in the form hereinbefore set out. * *

(16) All the wheat mentioned in the foregoing findings of fact was delivered to the defendant and received and treated by the defendant in pursuance of and according to the usage, custom and regular course of business set forth in the third and fourth findings of fact, and in all the transactions hereinbefore set forth both the defendant and the persons hereinbefore named contracted with reference to and relied upon the said usage, custom and regular course of business.

(17) On September 22, 1899, a fire occurred which, commencing in said flouring mill of defendant, spread and totally consumed said flouring mill and two buildings of the defendant, mentioned and described in the second finding of fact, and all the wheat then in said flouring mill and buildings of the defendant was either destroyed or rendered unmerchantable by reason of the occurrence of said fire.

(18) At the time of said fire there was no lightning or storm in or about the place where said flouring mill and buildings of the defendant were situated, or in or near Salem, Or.

(19) At and prior to the time of said fire the defendant had in its said flouring mill city water from the waterworks supplying the inhabitants of the City of Salem with water, which water was introduced into said flouring mill by means of a $3\frac{1}{2}$-inch standpipe, extending from the basement to the top floor of said flouring mill, and on each floor thereof the defendant kept and maintained a barrel of salt water, together with a hydrant and 50 feet of inch and a half hose, connected with said standpipe. There were also in said flouring mill six Babcock fire extinguishers, and the mill was swept and cleaned thoroughly twice a day, and there were dust collectors on all the machinery in said mill.

(20) On or about August 17, 1901, at Salem, Or., George O. Savage, plaintiff herein, and Lewis Savage, H. C. Fletcher, J. M. Munkers, George G. Ferrell, F. M. Smith, Tilmon Ford and J. O. Estes, being the persons named in findings of fact numbered from 6 to 15, both inclusive, and hereinbefore set forth, each tendered to the defendant in gold and silver coin of the United States $2\frac{1}{2}$ cents per bushel as storage and $3\frac{1}{2}$ cents per bushel for sacks for the several amounts of wheat delivered to the defendant by each of them, and said F. E. Commons, as hereinbefore set forth in said findings of fact numbered from 6 to 15, both inclusive, and each then and there offered to return to the defendant the load checks and receipts issued as aforesaid by the defendant, and each of them then and there demanded of defendant that it deliver to him the several and respective amounts of merchantable wheat so delivered to defendant as aforesaid, or, in case the defendant would not deliver said amounts of merchantable wheat as demanded, that it, the defendant, pay to each of them the reasonable market value thereof on that day at Salem, Or., but the defendant then and there refused, and still refuses to either deliver said amounts of wheat or to pay the market value thereof.

(21) The reasonable market value of merchantable wheat at Salem, Or., on August 17, 1901, was 50 cents per bushel.

(22) After making the tenders and demands set forth and hereinbefore mentioned in the twentieth finding of fact, and prior to the commencement of this action, the following persons named in said twentieth finding of fact, to wit, Lewis Savage, H. C. Fletcher, J. M. Munkers, George G. Ferrell, F. M. Smith, Tilmon Ford and J. O. Estes, each sold, assigned and transferred to the plaintiff, George O. Savage, all of his claim and demand against the defendant on account of the several amounts

of wheat delivered to the defendant by each of them, and said F. E. Commons, as hereinbefore set forth in findings of fact numbered from 6 to 15, both inclusive, and plaintiff has ever since then been, and now is, the owner and holder of each of such claims and demands."

The court finds these conclusions of law:

### CONCLUSIONS OF LAW.

"(1) In the transactions mentioned and described in the pleadings in this action, the defendant was not a warehouseman within the meaning and intent of the statutes of the State of Oregon made and provided for the regulation of warehouses and warehousemen.

(2) The legal effect of the transactions described in the foregoing findings of fact, taken in connection with the usage, custom and regular course of business also described in said findings of fact, was and is to vest in the defendant the right and to impose upon it the duty in any view of the pleadings and testimony to fulfill its obligation to any and all of the persons delivering wheat to it as set forth in the foregoing findings of fact, either by paying the market value of merchantable wheat at the time of demand made for same, or by delivering an equal quantity of merchantable wheat to the person or his assignor theretofore delivering wheat to the defendant.

(3) The further legal effect of the transactions described in the foregoing findings of fact, taken in connection with said usage, custom and regular course of business, was to pass the title of wheat so delivered to the defendant as aforesaid from the persons delivering the same to the defendant, and to make those transactions sales, and not bailments, of such wheat.

(4) Even granting that the allegations of the defendant's answer about the fire mentioned in said answer, and in the seventeenth finding of fact, are true as alleged, such allegations are not sufficient to enable the court to determine that the damage resulting from said fire was damage by the elements.

(5) The testimony given at the trial of this action does not prove that the damage to the wheat in said flouring mill and buildings of the defendant at Salem, Or., at the time of said fire, was 'damage by the elements' within the meaning of the phrase 'damage by the elements excepted,' as used in the form of receipt set forth in the third finding of fact.

(6) The precautions taken by the defendant to prevent fire in said flouring mill, as described in the nineteenth finding of fact, constitute, in respect to said flouring mill, at least ordinary care to prevent fire in said mill, but in view of the conclusion

that the title to the wheat in question was vested in the defendant at the time of the said fire, it is not material to form any conclusion in this action about the origin or effect of said fire.

(7) The following objections of the defendant, urged against testimony offered by the plaintiff at the trial of this cause, and reserved by the court for further consideration, should be and the same are each hereby overruled, to wit: * *

(8) The plaintiff is entitled to judgment against the defendant for the sum of $3,980.54, and for the costs and disbursements of this action."

The defendants excepted to findings 4 and 16, on the ground that they were not supported by the testimony, and moved the court for some additional findings, which motion being overruled, judgment was entered in favor of the plaintiff, in accordance with the findings and conclusions of law.     From this judgment the defendant appeals.          Affirmed.

For appellant there was a brief over the names of *Sanderson Reed* and *J. H. McNary,* with an oral argument by *Mr. Reed.*

For respondent there was a brief over the names of *Woodson Taylor Slater, William Marion Kaiser* and *Tilmon Ford,* with oral arguments by *Mr. Slater* and *Mr. Kaiser.*

Mr. Chief Justice Bean delivered the opinion.

1. The defendant contends that the complaint states a cause of action for breach of the contract under which the wheat was delivered by plaintiff and his assignors and received by it, and also for a conversion of such wheat; hence the demurrer to the complaint, or the motion made at the trial to require the plaintiff to elect upon which cause of action he would proceed, should have been sustained. But, as we read the complaint, it states but one cause of action, and that on contract. It sets out in detail the terms of the agreement under which the wheat was delivered and received, and alleges a breach thereof.    There is no charge that the wheat was wrongfully or unlawfully converted by the defendant to its own use, but, on the contrary, the allegation is that under the contract the defendant was entitled to use the wheat as part of its consumable stock and to sell or manufacture it into flour at its pleasure, discharging its liability

to the plaintiff and his assignors by either delivering to them other wheat of the same grade and quality, or by paying the market price of such wheat when demanded. A demand and refusal were necessary under the contract in order to fix the defendant's liability, for it was not required to pay for the wheat delivered, either in kind or in money, until requested to do so.

2. It is also urged that all the testimony tending to show the custom, usage and regular course of business of the defendant and persons dealing with it in regard to receiving, handling, disposing of and paying for wheat delivered, was incompetent, because the contract under which the wheat was delivered and received was embodied in a wheat receipt and could not be contradicted or varied by parol. When a receipt is issued by a warehouseman and accepted by the owner of goods stored as containing the terms and conditions upon which the commodity was delivered and received, it becomes the contract between the parties, and cannot be contradicted or varied by parol testimony; but when the receipt is silent as to the terms of the contract, they may be shown by parol, or, when the language of the receipt is ambiguous or uncertain, it must, like any other contract, be interpreted in the light of the surrounding circumstances: *Hirsch* v. *Salem Mills Co.* 40 Or. 601 (67 Pac. 940, 68 Pac. 733), and authorities cited.

3. And, in the absence of an agreement to the contrary, the usage or custom of a particular business will enter into and form a part of a contract made by a person engaged in such business and those dealing with him with knowledge of such custom and usage (*Morning Star* v. *Cunningham,* 110 Ind. 328, 11 N. E. 593, 59 Am. Rep. 211), although proof of custom or usage is never admissible to give interpretation to a contract inconsistent with its language: *McCulsky* v. *Klosterman,* 20 Or. 108 (25 Pac. 366, 10 L. R. A. 785) ; *Holmes* v. *Whitaker,* 23 Or. 319 (31 Pac. 705).

4. The receipt which defendant was accustomed to issue to persons delivering wheat to it is ambiguous, uncertain and indefinite on its face. It does not contain the name of the person from whom the wheat was received, nor truly state the quality

of such wheat, nor all terms and conditions upon which it was
received. It recites that the wheat was received in store "for
the account" of a named person, but not "from" such person
as the statute requires: B. & C. Comp. § 4602. It merely
relates that the wheat received was merchantable, while the
pleadings and evidence show that defendant had received and
had on storage at the time of the fire five different kinds and
grades of wheat of different values, and that two different grades
were received from plaintiff. It does not state that the wheat
would be returned or redelivered, but that it would be subject
to the order of the person for whose account it was received on
or before a certain date upon the payment of charges, and is
silent as to the terms of the contract under which it was to be
held and disposed of after the time stated. Moreover, the right
of the person for whose account it was received is limited and
restricted by the provision that the defendant "is to have the
first refusal of such wheat." The meaning of this latter clause
is doubtful, but was probably intended to give the defendant a
preferred right to purchase at all times, and to limit the right
of the holder of the receipt to receive grain in return therefor
to cases in which the defendant did not care to purchase. It is
manifest, therefore, that the load checks and receipts do not
alone express the contract. They are but part of the transaction.
Their importance is only made apparent upon proof of the
custom and usual course of business of the defendant, known
and acquiesced in by the depositors, and the purpose for which
they were issued. The entire contract between the defendant
and the persons delivering wheat to it was not embodied in the
written memoranda, and it is not from a consideration of the
writings alone that we are to determine the character of the trans-
action or the respective rights and obligations of the parties. The
entire contract must be ascertained from the custom and usage
of the business and the general understanding of the parties in
connection with such load checks and receipts. The words "in
store," used in the receipt, are not controlling as to the nature
of the transaction, as appears from the authorities referred to
hereafter.

5. A contention is made that some of the findings of fact are erroneous. The findings have the force and effect of a verdict of a jury, and cannot be disturbed if there is any evidence to support them. Without undertaking to refer to the evidence in particular or to recite it in detail, it is sufficient that the record discloses that there was much testimony given and received on the trial to support the findings as made, and they must, therefore, for the purposes of this appeal, be taken as true. Nor do we think the matters upon which additional findings were requested and refused material to the determination of any question arising on this appeal.

6. We come, then, to the merits of the controversy. The facts, as they appear from the pleadings and findings, are that on September 22, 1899, and for many years prior thereto, the defendant had owned and operated a flouring mill at Salem, in this State. Connected with the mill by means of mechanical wheat conveyors were storage houses or bins in which wheat purchased by the defendant to be manufactured into flour and such as it received from the neighboring farmers were mixed and commingled. According to the usual course of its business, when wheat was received from a farmer it was weighed by the defendant's weigher and a load check therefor was delivered to the farmer, showing the date and quantity of wheat delivered, which check could, if desired by the holder, be exchanged for a receipt in the form heretofore alluded to. No such receipt, however, was ever issued to the plaintiff and to but two of his assignors. After the wheat was received and weighed, it was, with the knowledge and by the consent of the farmer, conveyed into the warehouse and mixed and commingled with wheat belonging to the defendant, and thus became a part of the consumable stock of the mill, and thereafter, at its own convenience and pleasure and without further authority from the farmer, the defendant sold and shipped the wheat or ground it into flour or other mill products and disposed of the same for its own account and benefit. The farmer had a right at any time to demand the return of an equal quantity of wheat of like kind with that delivered or the market price of such wheat at the

time of the demand, and the defendant had the right to and generally did settle the transaction by paying the market value of wheat of like quality as that delivered, but in some instances settlements were made by delivering to the holder of the receipt wheat, equal in quality and quantity with that delivered, on payment of a certain sum per bushel for storage and for sacks. On September 22, 1899, the mill and warehouse were, with their contents, either totally destroyed by fire or so damaged as to be worthless. At the time of the fire there was due from the defendant to the farmers, including the plaintiff and his assignors, 122,534 bushels and 54 pounds of wheat, but of this amount only 105,372 bushels and 32 pounds were in the warehouse.

Upon this state of facts, the question for decision is whether the transaction between the plaintiff and his assignors and the defendant constituted a bailment or a sale. If the former, the title remained with the bailors and the loss must fall upon them, but if the latter, the title passed to the defendant at the time of the delivery, and thereafter the grain was held at its risk. It is often difficult to determine whether a particular transaction is a sale or a bailment, and especially so when it involves grain delivered to a person and by him mixed and mingled in a common mass with grain belonging to himself or other parties. If a specific amount of grain is delivered by the owner to be returned, either in its original or in an altered form, when called for, there is of course a plain case of bailment, but, when the grain of different owners is mixed and mingled in a common mass by their consent, a different and more difficult question arises. The original idea of a bailment contemplated the return of the identical article delivered as soon as the purpose of the bailment was accomplished: 2 Kent, Lect. 40; Story, Bailment, §§ 1, 2. But the business of storing, transporting and handling grain has grown to such proportions in recent years as necessarily to have wrought a change or modification in the doctrine requiring the subject of bailment to be returned to the bailor. The delivery to public warehouses or elevators of thousands of bushels of grain for storage and safe-keeping by hundreds of

owners, renders it impracticable, if not impossible, to keep that of the several owners separate so as to return the identical grain delivered, and this is no longer expected or required.

The only separation now called for by law is to keep grain of the same class in bins by itself so the owner may have returned to him grain of the kind and quality delivered, and therefore upon the deposit of grain with a warehouseman to be mixed with the grain of other persons, the depositor becomes the owner of his pro rata share of the entire mass, and the transaction is a bailment, and not a sale: *Brown* v. *Northcutt,* 14 Or. 529 (13 Pac. 485) ; *McBee* v. *Caesar,* 15 Or. 62 (13 Pac. 652) ; *Hamilton* v. *Blair,* 23 Or. 64 (31 Pac. 197). But the warehouseman is not authorized to use, sell or dispose of the grain stored with him, or any part thereof, without the consent of the owners. He may, from time to time, take from the common mass, upon the order or at the request of an owner, grain in amount equal to that stored for or by such owner, but he is required always to retain of the grain so stored sufficient to supply the other storers, and cannot use or dispose of any part thereof for his own benefit. He is a mere custodian of the grain, with no right to use it in any way, and herein lies the essential difference between a bailment and a sale. In the one case the title to the property remains in the depositor and the bailee is but a mere custodian, while in the other he may use and treat the grain as his own, the depositor relying upon his personal credit for the value thereof either in kind or in money. Where one delivers grain to another under an agreement that the identical grain or grain of similar kind and quality from the common mass into which it was placed shall be returned, there is a bailment, and the right of property remains in the bailor, but when, either from the express agreement of the parties or from the general course of business, the party receiving the grain has a right to use it in his business and as a part of his consumable stock and is not obliged to return the identical grain nor grain of similar grade and quality from the common mass, but may discharge his obligation to the storer by paying the market price

when demanded, or by returning other grain of the same kind and quality, there is no bailment, but a sale or exchange, and the title of the property and the risk are transferred to him.

To determine who shall bear the risk and enjoy dominion over grain which has been by common consent mixed and mingled with that belonging to other parties, we must therefore have recourse to the nature of the transaction, for the rights and liabilities go according to the legal title. "If the nature of the bargain be such," says Mr. Schouler, "as to make the several proprietors owners in common of the mass, any loss should be borne by them in proportion to their several interests; and such an ownership, we have said, is usually presumed. But if one throws his goods into the common mass, on the understanding that the party receiving them may take from the mass at pleasure and appropriate to himself on the condition that he shall restore other goods of the same sort in their stead—and so, too, in stipulations for pecuniary compensation—the dominion over the property passes to the receiver; and on this principle are some of our grain cases decided; the party owning the elevator or warehouse being treated as a purchaser, and not as a depositary"; 2 Schouler, Pers. Prop. § 46. This is the doctrine applied by this court in *State* v. *Stockman,* 30 Or. 36 (46 Pac. 851), and finds support in the authorities generally: 3 Am. Law Reg. (N. S.) 321; 6 Am. Law Reg. 455; *Richardson* v. *Olmstead,* 74 Ill. 213; *Lyon* v. *Lenon,* 106 Ind. 567 (7 N. E. 311); *Barnes* v. *McCrea,* 75 Iowa, 267 (39 N. W. 392, 9 Am. St. Rep. 473); *Weiland* v. *Sunwall,* 63 Minn. 320 (65 N. W. 628); *O'Neal* v. *Stone,* 79 Mo. App. 279; *Andrews* v. *Richmond,* 34 Hun, 20; *Chase* v. *Washburn,* 1 Ohio St. 244 (59 Am. Dec. 623); *Rahilly* v. *Wilson,* 3 Dillon, 420 (Fed. Cas. No. 11,532); *Insurance Co.* v. *Randall,* L. R. 3 P. C. 101.

In *Chase* v. *Washburn,* 1 Ohio St. 244 (59 Am. Dec. 623), which is probably the earliest leading case on the subject, the warehouse receipts were in the following form:

"Milan, Ohio, Nov. 5, 1847.
Received in store from J. C. Washburn (by son) the following articles, to wit:
Thirty bushels of wheat.                    H. Chase & Co."

In an action of assumpsit to recover the value of the wheat, Chase offered to show that his warehouse and sufficient wheat therein to cover all the outstanding receipts had been consumed by fire; that the custom of the warehouse was to store the wheat in a common mass and ship the same as occasion required, and, on presentation of a receipt, to pay either the highest market price of grain of like grade and quality or deliver other wheat. The court held that if, when Washburn's wheat was delivered to Chase, it became subject to his disposal either to retain or ship on his own account, the property passed and the risk of loss by accident followed dominion over it; that the transaction would not be a bailment, but the legal effect would be to create a debt which could be discharged by the warehouseman paying in wheat of like grade and amount or in money at the market price at the time of the presentation of the receipt; and that in either case the title to the wheat passed to the warehouseman, and he must bear the loss.

In *O'Neal* v. *Stone*, 79 Mo. App. 279, Stone owned and operated a flouring mill having in connection therewith an elevator. All wheat purchased to be ground and such as was received by him on deposit was mixed and commingled in the elevator, and the general bulk was drawn upon to supply the mill when in operation. The elevator and contents were destroyed by fire, after which Stone denied all liability under any of the receipts issued by him and outstanding. The wheat receipt stated that the party to whom it was issued had deposited with Stone a certain quantity of wheat of a certain grade and quality, for which he agreed to pay a certain rate per bushel for storage, and to assume all damage by fire, etc. The wheat was to be delivered to the party at the warehouse on demand, less a certain amount for shrinkage, and should Stone at the time of such demand not have the amount of wheat called for of equal grade and amount as that received, then he was to have the privilege of substituting an amount equal in value of a grade next above or below that received, and he was also to have the privilege of buying the wheat at the market price at the time of the demand. The court held the transaction to be a sale and not a bailment

(48th Or.—2)

and that the loss must be borne by the warehouseman, adopting the distinction between a sale and a bailment as pointed out by Sir William Jones in his Law of Bailment, in this wise: "If the goods delivered are to be returned, although in a changed form, it is a bailment, but if the intention is that either money or goods are to be received in exchange for them, there is a transmutation of property, and the obligation created is a debt and not a bailment": Jones, Bailments, § 105. And, in discussing the question, Bland, P. J., said: "The term 'bailment' implies that the owner of property has placed it in the hands of another who is at some time to redeliver it to the owner in its integrity or in an altered form agreed upon. If, therefore, the person to whom the property is delivered has the option to pay for it in money or in some other property or to restore it, such option is inconsistent with the character of bailment and the transaction is, in law, a sale, regardless of what the parties to the transaction may have called it or thought it to be."

In *Rahilly* v. *Wilson,* 3 Dillon (Fed. Cas. No. 11,532), a warehouseman issued a receipt in the following form:

"Received in store of P. H. Rahilly, —— bushels of No.—— wheat.     Geo. Atkinson & Co."

The litigation was between depositors of wheat receiving such receipts and the trustee in bankruptcy of the insolvent firm, and the court, Dillon, C. J., held that "where grain is stored in an elevator warehouse with the understanding, implied from the known and invariable course of business, that it may be sold by the warehouseman, and that when the depositor shall be ready to surrender the receipt of the warehouseman therefor, the latter will give the highest market price or the same amount of grain of like quality, but not the identical grain deposited, nor grain from any specific mass, the transaction is a sale, and not a bailment."

In *Andrews* v. *Richmond,* 34 Hun, 20, the plaintiff delivered to the defendants, who were millers, wheat and took back a receipt as follows:

"Canandaigua, November 14, 1878.
Received of Harris Andrews 490 bushels of wheat in store.

The same is subject to him or option to take price on or before the first of May next.                     Richmond & Smith."

The wheat was placed by Richmond & Smith in a bin containing some two or three hundred bushels of the same kind and quality of which they were the owners and from which they were drawing every day for the purpose of grinding, and when they received the wheat from the plaintiff they informed him that they intended to mix it with their own and manufacture it into flour. The mill was burned without the fault of the defendants. During all the time and up to the time of the fire there was more wheat on storage in the bins than. was delivered by the plaintiff. After the fire plaintiff informed the defendants that he had elected to sell the wheat to them at the then market price. In an action brought to recover such price, it was held that if the receipt alone was considered, the contract was one of bailment, but if it was agreed verbally, at the time the wheat was delivered, that it might be mixed by the defendants with their own wheat and be ground into flour at their pleasure, the transaction was, in law, a sale, and the title passed to defendants, who became liable to the plaintiff to pay him the market price of the wheat delivered or to return other wheat of the same grade and quality, as plaintiff might elect, and that plaintiff was entitled to recover. In the course of the opinion it is said: "The mere consent of the plaintiff that his wheat might be mixed with the wheat of the defendants of the same kind and quality was not inconsistent with a bailment *simpliciter.* Owners of the same kind of property and of equal value, like cereal grains or wines, may consent that they be mixed together in mass, and each, in law, will retain title to his aliquot part, and may maintain replevin for his share as against a wrongdoer who acquires possession of the same. By force of this rule the owner of grain in store may sell a certain quantity of the same, less than the whole, and pass title thereto, without separating the part so sold from the whole." But "an agreement that the particular article which the owner places in the hands of another may be by him consumed or sold in the course of trade is utterly inconsistent with the principles on which the law of bailment is

founded. The very term 'bailment' implies that the owner of an article has placed it in the hands of another, who is at some time to redeliver the same to the owner. If the owner consents that the person to whom he delivers the thing may consume or destroy it, it is not a bailment, whatever else the transaction may be in the law."

A very interesting and apt case, illustrative of the principles which should govern in the decision of the case at bar, is that of the *Insurance Co.* v. *Randall,* L. R. 3 P. C. 101. It was an action on a policy of insurance which stipulated that "goods held in trust or on commission must be insured as such, otherwise the policy will not extend to cover them." The plaintiffs were millers in South Australia. According to their custom and course of business, wheat was received by them from farmers to whom such course of business and dealing was known, and, on receipt, shot out of bags, in the presence of the farmer who brought it, into large hutches, where it became mixed with other wheat which had been received in like manner and thus became the common stock of the mill, which, according to the custom of business known to the farmer, was either sold by the plaintiffs or ground in their mill and disposed of for their benefit. On the delivery of the wheat to the plaintiffs they gave the farmers receipts in this form: "Received," etc., "in store." The farmer could at any time demand an equal quantity of grain of like quality and grade as that delivered by him to the plaintiffs, or the market price of an equal quantity, fixing the price as of the day on which he made his demand, and the plaintiffs had the option of delivering wheat of like quantity or paying the market price. The mill and its contents were destroyed by fire, and a claim was made by the plaintiffs to the insurance company for the loss, but the amount being in dispute, an action was brought by them to recover the value of the stock consumed. The plaintiffs declared on the policy, and the defendant pleaded that the wheat taken in storage by the plaintiffs from the farmers was held by them upon trust and therefore not covered by the policy. Issue was joined on the plea and the action tried before the chief justice and a jury. No evidence was adduced

by the defendant, but its counsel applied for a nonsuit on the ground that the evidence showed that the wheat was held in trust and was not the property of the plaintiffs. The chief justice declined to grant a nonsuit, and by consent a verdict was rendered in favor of plaintiffs with leave to the defendant to move for a verdict for it if the court should be of the opinion that the wheat was taken on storage and was in fact held in trust by the plaintiffs. A rule *nisi* was granted, calling on the plaintiffs to show cause why the verdict entered should not be set aside and one rendered for the defendant on the following grounds: First, the grain stored had not been insured by the defendant; and second, the wheat taken on storage by the plaintiffs was held upon trust, and was not within the terms of the policy. Upon argument, the judges being equally divided in opinion, the rule was discharged. From this judgment an appeal was taken to the Privy Council, where the case was affirmed after an elaborate and extensive argument on both sides, on the ground that the transaction between the plaintiffs and the farmers who delivered wheat to them was, in law, a sale, and not a bailment, and that the property of the wheat was so vested in the plaintiffs that they would have been compelled to bear the loss by fire if not indemnified by insurance, and, therefore, could recover from the defendant company.

From these decisions and the principles announced in them, it seems incontrovertible that, under the facts as disclosed by the record, the contract and agreement between the plaintiff and his assignors and the defendant, under which the wheat in question was delivered and received, cannot be construed to be a mere bailment, but it was, in law, a sale or exchange, and the liability for loss by fire was with the defendant. The wheat was not received by defendant to be stored for safe-keeping until called for by the owner, nor was it delivered with the understanding that it or other wheat of the same grade and quality from the common mass was to be returned. By consent of all parties it was mixed with and became a part of the consumable stock of the mill, and the defendant had a right to and did make such use of it as it saw fit, being liable to pay therefor,

when demanded, either in money at the market price of grain of like grade and quality, or in other wheat of the same grade and quality. The effect of the transaction was, therefore, to create a debt from the defendant to the depositors, which it could pay either in money or in kind. The provisions in the wheat receipts as issued by the defendant, "damages by the elements excepted," and for the payment of storage charges and sacks, did not vary the nature of the transaction or change what would otherwise be a sale or exchange into a mere bailment. The contract must be ascertained from the general course of dealing and the entire transaction, and not from a single provision or provisions which defendant has seen proper to include in its wheat receipts. It cannot, by inserting into its receipt some clause or clauses which, standing alone, are inconsistent with a sale, change the entire nature of the transaction, and make a bailment out of what, in law and in fact, was a sale or exchange.

We are cited to a number of cases which are supposed to support the defendant's argument that, although the identical wheat delivered was consumed by defendant, the case is nevertheless one of bailment, as there was all the time wheat in the mill and warehouse or elsewhere in the state belonging to the defendant, equal in amount to that delivered and of the same grade and quality: *Moses* v. *Teetors,* 64 Kan. 149 (67 Pac. 526, 57 L. R. A. 267) ; *National Bank* v. *Langan,* 28 Ill. App. 401; *McGrew* v. *Thayer,* 24 Ind. App. 578 (57 N. E. 262) ; *State* v. *Rieger,* 59 Minn. 154 (60 N. W. 1087). *State* v. *Rieger* was under a special statute, and the other cases cited were those of warehousemen who did not have the right to use the grain stored with them as a part of their consumable stocks and for their own use and benefit. We conclude, therefore, that, for the reasons given, the judgment of the lower court was right, and must be affirmed. There is, however, another view of the case which is worthy of consideration, although not specially relied upon by plaintiff. It appears from the answer of defendant, as we understand it, that prior to the fire it had used or shipped from the warehouse and mill a part of the wheat which it claims was stored with it, and, at the time, there was a shortage of about

17,000 bushels. It, therefore, did not have on hand wheat suffi-
cient to satisfy in full the claims of the parties who had depos-
ited wheat with it. If the original contract was a mere bailment
with the right in the defendant to ship or use the wheat depos-
ited, there are authorities holding that the character of the
transaction and the relation of the parties were changed when
any part of the wheat was so used or shipped, and it could there-
after, at the election of the bailor, be treated as a completed sale:
*Cloke* v. *Shafroth,* 137 Ill. 393 (27 N. E. 702) ; *Nelson* v. *Brown,*
44 Iowa, 455; *Bucher* v. *Commonwealth,* 103 Pa. 528.

The judgment of the court below will be affirmed.

Affirmed.

Decided 12 April, 1906.

On Petition for Rehearing.

Mr. Chief Justice Bean delivered the opinion.

There is no finding that it was specifically agreed that the
defendant should have the option to pay for the wheat in con-
troversy either in money or in kind. The court, however, in its
findings sets out in detail the facts constituting the contract
between the parties, from which it conclusively appears that
neither the wheat delivered by the plaintiff and his assignors
nor wheat from the common mass into which it was put was
to be returned, but that the wheat was to be mixed with and
become a part of the consumable stock of the mill, to be sold
and disposed of by the defendant on its own account. Findings
4 and 5, in substance, are that at the time the wheat was deliv-
ered and received, it was the custom and usual course of business
of the defendant, known to and acted upon by persons dealing
with it, for it to mix all wheat delivered with that belonging to
it in one common mass; the first refusal of such wheat being
reserved by and conceded to the defendant; and thereafter, "at
its own convenience and pleasure" and "without any written
authority," to "ship out any of such common mass * * or grind
the same into flour and other mill products and the same to sell
for the account and benefit of the defendant," and, generally, in
settlement of the claims arising out of such delivery to "pay by

bank check or in money to the person delivering the wheat the market value at Salem, Or., on the day of settlement, of merchantable wheat of the quantity delivered, less warehouse charges," although, in some instances, settlements were made by delivery of wheat equal in quality and quantity to that received. And finding 16 is that the wheat of the plaintiff and his assignors was delivered and received in pursuance of and according to such usage, custom and regular course of business, and that the parties "contracted with reference to and relied upon" the same. The custom and general course of business, therefore, entered into and became a part of the contract between them, and the legal effect of the transaction is that the wheat was delivered and received under an agreement that it should be mixed with wheat belonging to the defendant and that the latter could, at its own convenience and pleasure, and without any further authority from the persons delivering it, sell and dispose of the wheat or grind it into flour and other mill products and sell the same for its own account and benefit; and this, as we have endeavored to point out, constitutes a sale, and not a bailment. The fact that there was no special or distinct agreement that defendant should have the option to pay for the wheat either in money or in kind is unimportant. If, as the findings show, neither the wheat delivered nor wheat from the common mass with which it was mixed was to be returned to the farmers, but it was understood that it should become a part of the consumable stock of the mill to be sold and disposed of by the defendant as its own, it necessarily follows that the title passed. The defendant could only discharge its obligation by paying for the wheat in some way, and whether it was required to make such payment in money, or had the option to pay in money or in kind, cannot change the legal effect of the transaction.

The petition for rehearing is therefore denied.

7. There is, however, a cross appeal by the plaintiff, which was not referred to in the opinion heretofore filed. The court below denied the plaintiff interest on the value of the wheat from the time of the demand in August, 1901, and from this ruling he appeals. As we have seen, this is an action on a contract to

recover the value of the wheat delivered by the plaintiff and his assignors to the defendant. The value of such wheat became due and payable on demand according to the contract, and should, therefore, bear interest from that time: .B. & C. Comp. § 4595. The judgment will be modified accordingly, and the cause remanded to the court below, with directions to enter a judgment on the findings of fact in favor of the plaintiff for the value of the wheat delivered by him and his assignors to the defendant, together with legal interest thereon from the date of .the demand.                          MODIFIED AND AFFIRMED.

REHEARING DENIED.